924 So.2d 1107 (2006)
STATE of Louisiana
v.
Jonathan H. ROSE.
No. 05-KA-770.
Court of Appeal of Louisiana, Fifth Circuit.
February 27, 2006.
*1108 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler-Appellate Counsel, Assistant District Attorneys, Gretna, Louisiana, for Appellee, State of Louisiana.
Prentice L. White, Baton Rouge, Louisiana, for Appellant, Jonathan H. Rose.
Panel composed of Judges THOMAS F. DALEY, SUSAN M. CHEHARDY, and WALTER J. ROTHSCHILD.
SUSAN M. CHEHARDY, Judge.
This is defendant's second appeal before this Court. On August 26, 2002, the Jefferson Parish District Attorney filed a bill of information charging defendant, Jonathan H. Rose, with conspiracy to commit armed robbery, armed robbery, and assault by drive-by shooting in violation of La. R.S. 14:26:64, R.S. 14:64, and R.S. 14:37.1, respectively.[1] Defendant was arraigned on September 9, 2002 and pled not guilty. On October 9, 2003, defendant's motion to suppress statement was denied.
On April 14, 2004, trial before a 12-person jury commenced, after which defendant was found guilty as charged on each count. On June 3, 2004, the trial court denied defendant's motion for new trial. That same date, the trial court sentenced defendant to imprisonment at hard labor for 30 years on count one, 50 years on count two, and five years on count three, with all sentences to be served concurrently. The trial court ordered the sentences on counts one and two to be served without benefit of parole, probation, or suspension of sentence and the sentence on count three to be served without suspension of sentence. On June 9, 2004, defendant filed a motion for appeal, which was granted.[2]

Facts
At trial, Candace Darcy testified that she was working as a teller at the Jefferson Parish School Board Credit Union in Harvey, Louisiana on June 17, 2002, when two men with handguns ran into the bank. One of the men came to her window, showed her the gun, and demanded money; the other man ran to the receptionist's desk. Ms. Darcy passed the money from her cash drawer, which exceeded $12,000.00, to the man. The men immediately fled into a waiting car, which Ms. Darcy identified as a Geo Metro. Ms. Darcy saw another person waiting in the driver's seat of the car. She was unable to identify any of the perpetrators.
Deputy Joseph Ragas of the Jefferson Parish Sheriff's Office ("JPSO") patrol division testified that he was patrolling on Peters Road in Harvey on June 17, 2002 *1109 when he heard a broadcast over his police radio that a bank robbery had just occurred at Lapalco Boulevard and Paxton Street. The broadcast stated that the suspects, described as two black males, had fled the scene in a small blue vehicle. In response to that broadcast, Deputy Ragas waited on Peters Road on the east side of the Lapalco Bridge in the u-turn lane. Within minutes, Deputy Ragas observed a "small colored vehicle" occupied by two black males dressed in black traveling eastbound on Lapalco.
When Deputy Ragas pulled up behind the vehicle, it sped off, which caused him to suspect that it might be the vehicle used in the robbery. Deputy Ragas broadcast the description of the vehicle and its license plate number over the radio, requested assistance, put his lights and sirens on, and started pursuing the vehicle. After he did so, the vehicle crossed over the concrete median and began traveling westbound into oncoming traffic. After traveling westward on Lapalco for approximately two blocks, the vehicle turned onto Brooklyn Avenue.
When Deputy Ragas pursued the vehicle down Brooklyn, the passenger in the vehicle pointed a gun directly at Deputy Ragas' windshield and fired at least three shots. The pursuit ended at the dead end on Brooklyn Avenue when the suspects abandoned the vehicle.
Detective Jeffery Rodrigue of the Robbery Unit of the JPSO testified that, after the robbery, officers recovered a surveillance videotape from the credit union's camera and a stack of twenty dollar bills totaling $1,000.00 from the parking lot of the credit union. He further testified that a firearm was recovered from the vehicle abandoned by the suspects; however, investigators determined that the firearm had not been fired.
Detective Rodrigue was notified at the scene that Danielle Givens had reported that her blue Geo Metro had been stolen. During his interview with Givens, he learned she was the girlfriend of Jerimie Rose. Givens eventually admitted that her car had not been stolen but that she had loaned the car to someone. Based on information obtained from his interviews with Givens and Rose, Detective Rodrigue obtained an arrest warrant for Jonathan Rose, defendant herein, in June of 2002. He also learned that defendant had fled the jurisdiction.
In August of 2002, Detective Rodrigue learned that defendant had returned to Louisiana and was staying at his girlfriend's house. When Rodrigue went to Jefferson's house to execute the warrant, Jefferson informed Rodrigue that she was there alone. JPSO Deputy Nick Davidson, who was watching the back of Jefferson's house, caught the defendant leaving the house and attempting to jump the back fence. After defendant was apprehended, Detective Rodrigue advised defendant of his rights, which defendant indicated he was willing to waive. Defendant then accompanied the officers to the JPSO Criminal Investigations Bureau, where he gave a statement.
In that statement, dated August 6, 2002, defendant said that he and two other men  "T" and another man, whose name he did not know  were outside talking about riding around and robbing people to get money. He indicated that he borrowed the blue car they were in from his brother's girlfriend, Danielle. Defendant stated that he was the driver and "T" was the passenger, and that the other man was seated in the backseat on the passenger side. Defendant explained that they pulled up to a bank off of Lapalco, and that he and "T" jumped out and went in. *1110 He stated that it was the man in the backseat's idea to do so.
Defendant said that he did not have a gun, but that "T" did. They went into the bank and demanded money, and the woman sent the money through the window. Defendant took the money and put it in a white pillowcase, and the two of them exited the bank, jumped in the car, and left. Defendant said that he sat in the driver's seat and that "T" sat in the passenger seat. They traveled down Lapalco by the bridge and saw a police car. Defendant said that he drove across the median and went down Brooklyn Street
Defendant explained that it was at that time that "T" shot at the police officer approximately three to five times. He said that once the shooting started, the police officer stopped pursing them. He and the other two men got to the end of the road, jumped out, ran through the bushes, and came out by the Time Saver. Defendant stated that they divided up the money in the bushes, and that he got approximately $3,000.00 from the robbery. He said that he did not remember what he was wearing the day of the robbery, but that "T" was dressed all in black. Defendant explained that he traveled by bus to Cincinnati, Ohio after the robbery. Finally, he stated that he had been arrested behind his girlfriend's apartment complex the same day that he was giving the statement. After playing the statement for the jury, the State rested.
Defendant then testified on his own behalf, that, on the night of June 16, 2002, he borrowed Givens' car to bring his family to the grocery store. He indicated that he was supposed to return the car the next morning at approximately 9:00 or 9:30 a.m. Defendant stated that the next morning before he returned Givens' car, he ran into "T" and his friend who were having a discussion regarding going somewhere. When "T" and his friend offered defendant $60.00 worth of crack cocaine in exchange for use of the car, he agreed. He testified that "T" and his friends dropped him off at a crack house on Manhattan Boulevard, where he got "loaded."
According to defendant, "T" and his friend were supposed to pick him up in an hour or so and return the car he lent to them. The two men never returned with the car, so defendant got his cousin to bring him home. Later that afternoon, defendant saw "T" and his friends and inquired after Givens' car. Defendant testified that, during this discussion, "T" told him that he and his friend had robbed a bank using Givens' car as the get-away car. Defendant then informed "T" that "T" would have to "take his charge" for the robbery. Defendant stated that "T" then pulled a gun on defendant and told him that if he said anything "T" would hurt him or his family.
Defendant explained that in June, he stayed with family and friends, and that, on July 1, 2002, he went to Ohio where he stayed with his aunt. He returned to the area in August and stayed at his girlfriend's house until he was arrested on August 6, 2002.
At trial, defendant explained that he lied when he confessed to the armed robbery in his statement to the police because his life was being threatened by the men who actually committed the robbery. He stated that he told the officer before he gave his statement that he did not commit the robbery, but the officer did not believe him. He further stated that he knew details of the robbery for two reasons: first, "T" had told him what happened and, second, the officer showed him photographs before he gave his statement. Defendant admitted he had a conviction in 1993 for aggravated oral sexual battery for which he received two years probation.
*1111 In rebuttal, the State called Jerimie Rose, defendant's brother, as a witness. Rose testified that he had been convicted of two counts of burglary, unauthorized use of a movable, two counts of possession of stolen property, theft, and criminal damage to property. He admitted that, as a result of having loaned his girlfriend's car to defendant in this case, he had been charged with conspiracy to commit armed robbery, and that he had pled guilty to that offense. He testified that in exchange for his guilty plea, he would be sentenced to no more than five years in prison, which was much less than his exposure as a multiple offender. He further testified that as part of that plea agreement, he agreed to testify as a witness in this case if the State deemed it appropriate.
Jerimie Rose testified that, on June 17, 2002, defendant asked to borrow his girlfriend's car because he was going to "shake something" or "hit a lick," which in street parlance may mean to execute a robbery. Jerimie explained that defendant told him that he would receive "five" in return for lending him the car; however, Rose did not know how much money that meant he was going to receive. He testified that he did not get any money, and that he falsely reported his girlfriend's car being stolen.
The State also called Detective Rodrigue as a witness in rebuttal. Detective Rodrigue testified that, before giving the taped statement, defendant did not deny participating in the armed robbery. Detective Rodrigue further testified that he did not show defendant any photographs before taking the taped statement from him. After hearing the testimony and considering the evidence, the jury found defendant guilty as charged on all counts. Defendant now appeals his conviction.
In his sole assignment of error, defendant argues that the trial court erred in denying his motion to suppress his statement to the police. He contends that he told the police that he was involved in the robbery in order to protect himself and his family. He points out that his statement contained several material inconsistencies that would not have been made by someone who actually participated in the robbery. He notes that his statement should have been suppressed in light of the State's failure to show that his statement was made voluntarily and without threats, promises, or coercion. In response, the State avers that the statement was freely, knowingly, and voluntarily given and, therefore, the trial court did not err in denying defendant's motion to suppress the statement.
Before an inculpatory statement, made during a custodial interrogation, may be introduced into evidence, the State must prove beyond a reasonable doubt that defendant was first advised of his Miranda[3] rights and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement or promises. La. R.S. 15:451; State v. Quest, 00-205 (La.App. 5 Cir. 10/18/00), 772 So.2d 772, 780, writ denied, 00-3137 (La.11/2/01), 800 So.2d 866. A determination of voluntariness is made on a case-by-case basis, depending on the facts and circumstances of each situation. Id. The admissibility of a confession or statement is a determination for the trial judge and his conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. Id. In determining whether the ruling on a *1112 defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the hearing on the motion to suppress but may also consider pertinent evidence given at the trial. State v. Higgins, 01-368 (La.App. 5 Cir. 10/17/01), 800 So.2d 918, 921, writ denied, 01-3267 (La.11/1/02), 828 So.2d 565, cert. denied, 538 U.S. 1038, 123 S.Ct. 2082, 155 L.Ed.2d 1070 (2003).
At the hearing on the motion to suppress the statement, JPSO Detective Jeffery Rodrigue testified that, before he took the statement from defendant, he advised defendant of his rights using a JPSO standard rights of arrestee or suspect form. He further testified that defendant indicated to him that he understood those rights; that defendant signed the waiver of rights form; that defendant did not appear to be inebriated or impaired while he was speaking to him; that he did not force, threaten, or coerce defendant to make a statement; and that he did not offer or promise defendant anything in return for making the statement. The rights form was introduced without objection into evidence at the suppression hearing and at trial.
Detective Rodrigue explained that, from the time he began advising defendant of his rights until the time he completed the taped statement, defendant did not indicate to him that he wished to speak to a lawyer or that he wished to terminate the interview. Detective Rodrigue testified that, during the half-hour pre-interview before he took the statement, defendant said the same things that he said in his statement. He further testified that he had no difficulty obtaining an inculpatory statement from defendant, that defendant did not appear to be frightened, that defendant did not tell him that someone had threatened him, and that defendant did not seem to be concerned about his family.
At the suppression hearing, defendant did not introduce evidence to support defendant's contention that he gave an inculpatory statement in order to protect himself and his family. Further, although defendant testified at trial that he gave an inculpatory statement in order to protect himself and his family, he did not offer corroborating evidence to support his claim. Additionally, and more importantly, defendant implicated "T" in the robbery in his statement and at trial, thus, his contention that he lied about his involvement in the robbery to protect himself and his family from "T" lacks credibility. Finally, although defendant argues that his statement contained inconsistencies that corroborate his claim that he did not take part in the robbery, he does not point out these alleged inconsistencies nor did our review reveal any inconsistencies in his statement.
Based on the foregoing, we find that the record indicates that defendant was advised of his Miranda rights and that the statement he subsequently gave was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement or promises. Accordingly, we find that the trial judge did not abuse his discretion in denying the motion to suppress defendant's statement.
Finally, we have reviewed the record for errors patent, according to La. C.Cr.P. art. 920. We have found one error requiring correction. After sentencing, the trial judge's post-conviction relief advisal was incomplete because the trial judge failed to state when the period would begin to run. Therefore, we remand this matter to the district court and order it to inform defendant of the provisions of La.C.Cr.P. art. 930.8 by sending appropriate written notice to defendant within ten days of the rendition of this Court's opinion and to file written proof that defendant received the *1113 notice in the record. State v. George, 99-887 (La.App. 5 Cir. 1/4/00), 751 So.2d 973, 975. Accordingly, we affirm the defendant's conviction and sentence and remand for compliance with La.C.Cr.P. art. 930.8.
AFFIRMED; REMANDED.
NOTES
[1] Danielle Givens and Jerimie J. Rose were also charged in the same bill of information with conspiracy to commit armed robbery.
[2] On July 19, 2005, this Court, after a jurisdictional review, noted that the sentencing transcript did not reflect that the trial judge had sentenced defendant on count three, dismissed defendant's appeal as premature, and remanded the case to the district court for sentencing on count three. This appeal was subsequently lodged with a complete sentencing transcript from June 3, 2004, which showed that the trial judge had already sentenced defendant on count three.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).