FREDERICKA HOMBERG WICKER, Judge.
| ¡/This is the third case in a series of the Gomez Bar murders to come before this Court on appeal. In this case, the defendant appeals his convictions and three consecutive life sentences for three counts of second degree murder. He contends that the trial court erred in failing to grant the motion to suppress his statement; by not requiring a unanimous jury verdict; and by imposing consecutive sentences. For the reasons that follow, the convictions and sentences are affirmed.
Factual and Procedural Background
On October 30, 2008, shortly after 2:00 P.M., the defendant/appellant, Renil Escobar-Rivera (“Escobar”), Jose Cornejo-Garda (“Garcia”), Mario Funes (“Mario”), Rigoberto Funes (“Rigoberto”), and Pedro A. Navarrete-Duran (“Navarrete-Duran”), entered Gomez Bar[1] for the purpose of committing an armed robbery. Escobar, the mastermind behind the robbery, was armed with a .357 magnum and provided his co-perpetrators Mario and Rigoberto with a .380 semfjautomatic3 and a .22 handgun, respectively. The five men entered Gomez Bar with their weapons concealed. They purchased drinks from the bar and played pool for approximately twenty minutes.
While the men played pool, seventy-one year old Mr. Wallace Gomez, one of the bar’s owners, cashed a check in the back room for one of his regular patrons — Mr. Earl Scioneaux. Once Mr. Scioneaux received his cash, he began playing video poker. While playing poker, however, Mr. Scioneaux heard Wallace Gomez exclaim, “you must be joking.” Mr. Scioneaux then turned and observed Escobar holding a gun to Wallace Gomez’s head. Escobar *3 turned briefly, made eye contact with Mr. Scioneaux, and then forced Wallace Gomez down the hallway. Almost instantaneously, Mr. Scioneaux turned and saw the other robbers, with guns drawn, forcing the other bar patrons to the rear of the bar. One of the robbers approached Mr. Scion-eaux and demanded of him, in English, to turn around and put his hands up. The robber then rummaged through Mr. Scion-eaux’s pockets and retrieved his cell phone, wallet, and pocket change.
Outside of the bar, Mr. Patrick Smith, a man in his early eighties, prepared to enter Gomez Bar with his friend, Donald, as he had done numerous times in the past. As soon as they entered, however, one of the men immediately attempted to rob them. Mr. Smith would not relinquish the money he had in his hand, so the robber knocked him down. He then looked up at Donald and said “follow me,” because he had a feeling something bad was about to occur. The two men went to the back kitchen area where Mr. Smith used his cell phone to call 9-1-1. While on the phone with the dispatcher, shots were fired. Mr. Smith and others then attempted to exit the bar through a back room. However, a locked gate prevented them from doing so.
14Meanwhile, Escobar, who still had the gun held to Wallace Gomez’s head, arrived in the back room where the safes were stored. Unknown to Escobar, however, Wallace Gomez kept a .38 revolver behind the door. Wallace Gomez attempted to close the door to retrieve the gun, but Escobar placed his foot in the doorway as a barrier. Once Wallace Gomez retrieved the gun, he stuck its barrel through the door opening and fired. Escobar immediately ran from the back yelling something in Spanish. All of his accomplices, except Mario, responded by fleeing from the bar. Mario was kneeling behind the bar with a gun brandished on one of the bar’s elderly employee’s collecting money that had fallen from the cash register.
Meanwhile, Wallace Gomez ran from the back room with his revolver. Mr. Scion-eaux warned him, however, that one of the robbers was still behind the bar. At that point, Mario appeared, and he and Wallace Gomez stood face-to-face. Wallace Gomez paused and asked Mario if he was with the robbers. Unfortunately, Mario gestured with his gun, and the tragedy ensued. Wallace Gomez fired his gun, and Mario returned fire. The two then shot each other multiple times. These were the shots Mr. Smith heard while on the phone with the 9-1-1 dispatcher. Wallace fell, and his head bounced on the concrete floor. Mario fell to the floor as well. Mr. Beauford Gomez, Wallace Gomez’s brother, was sitting on a bar stool behind Mario and was caught in the crossfire. He slumped over the bar stool and fell to the floor.
Hearing the gunshots and realizing that Mario was still in the bar, Escobar and Rigoberto ran back inside the bar with their guns drawn. Seeing his brother on the floor, presumably dead, Rigoberto immediately opened fire with his .22, firing multiple shots and ultimately killing two other bar patrons. Rigoberto then threw the gun down on the floor and went to render aid to his brother. Mario still had the |fi.380 semiautomatic in his hand. Rigoberto attempted to fire Mario’s gun, but it was jammed. He then threw that weapon down, but Escobar retrieved it and placed the gun in his pocket. Rigoberto and Escobar then dragged Mario from the bar and headed toward the door. Navar-rete-Duran and Garcia did not reenter the bar. They returned to the get-a-way car waiting for the other three men to return.
Once Rigoberto and Escobar emerged from the bar with Mario, they observed a police officer driving down the street. Es- *4 cobar abandoned the two men, jumped in the back seat of the get-a-way car, and ordered Garcia to get out to help Mario and Rigoberto. When Garcia exited the car, however, Escobar forced Navarrete-Duran to drive away. The two men then left Garcia, Rigoberto, and Mario to face the music alone.
Before Navarrete-Duran drove away, however, Mr. Charles Henning was sitting in the parking lot outside of the bar filling out a check that he planned to cash inside the bar. While sitting there, a friend of his opened his truck door and asked whether he heard gunshots. Mr. Henning had not heard anything because his windows were rolled up, and the engine and air conditioner were running. When he looked up, however, he observed three men exit the bar — one of whom had blood dripping from his head and abdomen. He witnessed the men walk toward a 2006 Honda Accord that was parked in the lot. Mr. Henning jotted down the license plate number, make, and model on a napkin.
Around that same time, Deputy Rhonda Goff of the Jefferson Parish Sheriffs Office was driving down Fourth Street headed to her 2:30 P.M. roll call when she observed the three men, who were all covered in blood, walk directly toward her. Observing the men covered in blood, Dep. Goff activated the patrol | alights, turned on the radio, and reported a call about a suspicious person.[2] When the men saw her, they changed directions and started walking up Eiseman — the' street that intersected with Fourth Street. Dep. Goff made a U-turn, pulled up behind the men on Eiseman, exited the unit, and approached them. The men walked away, but she followed them and asked what was wrong. The men stated that they did not speak nor understand English. Dep. Goff then instructed the two men to put the man in the middle down. The injured man, Mario, raised his shirt and revealed what appeared to be a gunshot wound to his abdomen. A witness then ran from the bar and yelled, “watched out, they just shot a bunch of people in the bar.”
Dep. Goff immediately shoved the two uninjured men, Rigoberto and Garcia, onto her unit and placed herself on top of them in order to handcuff them. She searched the men and removed wallets from their pockets, which she placed on top of her unit. Once backup arrived, Dep. Goff entered the bar alone and observed what she described as a “horrific scene.”
The bar was completely covered with blood and money. Wallace Gomez was dead on the floor next to the end of the pool table. He had sustained a fatal gunshot wound in the right upper chest. Beauford Gomez sustained a fatal gunshot wound in the back and was located on the floor near the bar. Wayne Hebert sustained a gunshot wound in the chest. And Jeffrey Carmadelle sustained a gunshot wound to the left upper chest and lower abdomen. Mr. Hebert and Mr. Carma-delle were both transported to the hospital but died shortly after arriving there.
Around 4:00 P.M., Escobar and Navar-rete-Duran arrived at the Tallowtree Apartments — which was located about two miles from the bar. Escobar’s friend, 17Brandi Diaz, lived in apartment 406 with her roommate Donna Lopez. Donna and Brandi knew Escobar but neither of them knew Navarrete-Duran.[3] Escobar knocked on the door and asked if they *5 could come inside for a glass of water. Donna gave both of the men a wine glass filled with water and ice. They drank the water and placed the glasses on the end table. Escobar then used his Motorola cell phone to place a phone call. After making the call, Escobar removed the battery and placed the cell phone on the table. Brandi noticed the blood on Escobar’s clothing and asked him what was wrong. He explained that they had gotten into a fight down the street. Escobar then went to the bathroom, turned on the shower, and tried to clean up. When Brandi heard the water, however, she told him that he could not shower in their house because their boyfriends were on the way home. Yet, Escobar remained in the bathroom for an additional 10 minutes before coming out.
Escobar, Navarrete-Duran, and Brandi then went outside where they each smoked cigarettes, discarding the butts on the ground. Escobar folded two white Hanes socks inside one another, stuffed a gold-type cardboard card between them, and placed them in the trash can sitting outside the neighbor’s front door. Escobar, who was wearing cargo khaki shorts, asked Brandi if he could borrow a pair of her boyfriend’s pants. Brandi gave Esco-bar a pair of black pants that had a white and yellow stripe down the sides. Brandi then noticed a shirt on the ground that she had seen Escobar wear numerous times. When she picked the shirt up, two guns fell out — a chrome revolver and a black automatic. Escobar picked up the guns off the ground, wrapped them back in the shirt, and took a towel that was hanging on the outside railing and wrapped it around the shirt. He then asked Brandi to hide the guns, but she refused. Escobar grabbed Brandi’s hand and placed something |swet inside. When she opened her hand, she saw bloody money which she threw back at Escobar. She then told them to leave. As they stood there, however, police began to fill the area. Esco-bar began to cry and told Brandi that he thought Mario was dead. As more police filled the area, however, Escobar took off towards Orange Blossom, which is a neighborhood behind Tallowtree. Navarrete-Duran ran in the opposite direction. A few minutes later, both the men returned to Brandi’s apartment, but she ran inside and closed the door. The men then took off towards the Westbank Expressway and hid in a canal for approximately four hours.
The police arrived at the Tallowtree Apartments shortly after 4:00 P.M. — -just after Escobar and Navarrete-Duran fled the scene. They had obtained a description of the car and license plate number from Mr. Henning and discovered that the car was registered to Navarrete-Duran. The police then canvassed neighborhoods with large Hispanic populations and found the car parked at the Tallowtree Apartments. Residents in the area informed them that the car’s occupants had entered apartment 406. Det. Mike Cummings learned from Brandi and Donna that the two suspects had been at their apartment earlier. He obtained a consent to search the apartment from Donna wherein the crime scene unit seized a Motorola battery and cell phone, the two white socks Esco-bar had abandoned, a stemmed wine glass, and one wrapper with a gold-type cardboard card. They also seized the three cigarette butts that Brandi, Navarrete-Duran, and Escobar discarded.
Once Escobar was established to be a suspect, his name and description were placed into a statewide and nationwide database. Approximately one week later, on November 6, 2008, Escobar was arrested in San Antonio, Texas. Det. Keith Locas-cio, the lead detective, along with Det. David Canas, traveled to San Antonio on November 7, 2008, to interview Escobar.
*6 Det. Canas, who was fluent in both |9Spanish and English, accompanied Det. Locascio for the sole purpose of serving as a translator for both Escobar and Det. Locascio. When the detectives arrived in San Antonio, Escobar was advised of his Miranda rights in Spanish. He also signed a Spanish Rights of Arrestee form in which he indicated that he understood his rights and wished to waive them. Es-cobar admitted that he participated in the robbery that occurred at the Gomez Bar. He admitted to obtaining the guns used during the robbery and stated that he was armed with a .357 magnum. He stated, however, that he never discharged his weapon and that he never intended to hurt anyone.
On February 26, 2009, a grand jury indicted Escobar with four counts of second-degree murder in violation of La. R.S. 14:30.1.[4] Escobar pled not guilty at the arraignment and moved to suppress his statement, the evidence seized, and the identification made. All motions were denied. On March 22, 2010, Escobar’s motion to declare La.C.Cr.P. art. 782(A) unconstitutional was also denied. However, his motion to quash Count Two of the indictment — La. R.S. 14:30.1 in relation to Beauford Gomez — was granted.[5] Escobar was tried by a twelve-person jury for the second degree murders of Wallace Gomez, Wayne Hebert, and Jeffrey Carmadelle. The jury found him guilty on all counts. Escobar was later sentenced to life imprisonment at hard labor for each of the three convictions. The sentences were imposed without benefit of probation, parole, or suspension of sentence and were ordered to run consecutively.
| ^Assignments of Error
Escobar contends that the trial court erred in failing to grant the motion to suppress his statement; by not requiring a unanimous jury verdict; and by imposing consecutive sentences.
Discussion

First Assignment of Error

In his first assignment of error, Escobar contends that the trial court erred in failing to suppress his statement. He argues that his waiver was not knowing and intelligent because the waiver of rights form was in English and because Det. Canas was not a certified translator.
The State has the burden of proving the admissibility of a purported confession or statement made by a defendant. State v. Arias-Chavarria, 10-116, p. 11 (La.App. 5 Cir. 9/28/10), 49 So.3d 426, 433, writ denied, 10-2432 (La.2/25/11), 58 So.3d 460. Before introducing a defendant’s inculpatory statement made during a custodial interrogation, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda rights, and that the statement was made “freely and voluntarily, and not under the influence of fear, intimidation, menaces, threats, inducement or promises.” State v. Rose, 05-770, p. 9 (La.App. 5 Cir. 2/27/06), 924 So.2d 1107, 1111, writ denied, 06-1286 (La.11/22/06), 942 So.2d 554. In reviewing a trial court’s ruling as to the admissibility of a confession, the court’s conclusions on the credibility of witnesses are entitled to the respect due those made by one who saw the witnesses and heard them testify. State v. Barton, 02-163 (La.App. 5 Cir. 9/30/03), 857 So.2d *7 1189, writ denied, 03-3012 (La.2/20/04), 866 So.2d 817. A trial court’s ruling will not be overturned on appeal unless it is unsupported by the evidence. Barton, supra, at 1200.
|nThe record in this case reflects that Escobar’s statement was knowing, intelligent, and voluntarily made. Escobar signed the JPSO’s Spanish Rights of Ar-restee form and initialed next to each of the rights he waived. In addition, Det. Locascio and Det. Canas testified that Es-cobar was also orally advised of his rights in Spanish and indicated that he understood those rights. They further testified that Escobar was not promised anything in exchange for the statement he provided. Det. Canas, who was fluent in Spanish, testified that he translated Det. Locascio’s questions from English to Spanish and then translated Escobar’s answers from Spanish to English. Escobar argues, however, that the waiver was insufficient because Det. Canas was not a certified translator.
Although Det. Canas was not a certified translator, the record reveals that he was, indeed, fluent in Spanish. Det. Canas testified that he was born in Columbia, South America and lived there until he was eight years old. He then came to the United States for two years but returned to Columbia for an additional three years. He further stated that he only spoke Spanish as a child and continues to only speak Spanish at his parent’s home. Moreover, Det. Canas stated that he took advanced Spanish courses in high school and that he enrolled in Spanish courses during college.
The admissibility of a statement or confession is first a question for the trial court, and its conclusions on the credibility and weight of testimony relating to volun-tariness of a statement will not be overturned on appeal unless not supported by the evidence. State v. Terrick, 03-515, p. 10-1 (La.App. 5 Cir. 9/30/03), 857 So.2d 1153, 1159-60. Considering the totality of the circumstances, we find that the State met its burden of proving that Escobar’s statement was knowingly and voluntarily made. Therefore, this assignment of error is without merit.

Second Assignment of Error

|12In his second assignment of error, Escobar contends that the trial court erred in not requiring a unanimous jury verdict.
First, it is worth noting that there is no evidence in the record to indicate whether a non-unanimous jury convicted Escobar. Defense counsel did not request that the jury be polled nor are there juror slips in the record. Thus, Escobar cannot complain of a non-unanimous jury conviction if he was, indeed, convicted by a unanimous jury. Furthermore, we find that Escobar did not object to the jury instructions at trial. In fact, we have combed the record and find that throughout the course of the trial, the judge asked both the State and Defense, numerous times, whether the jury charges were acceptable. Each party indicated that they were.
In order to seek appellate review of an alleged trial court error, a party must make a contemporaneous objection at trial, and he must state the grounds for the objection. La.C.Cr.P. art. 841; State v. Gaal, 01-376 (La.App. 5 Cir. 10/17/01), 800 So.2d 938, 949, writ denied, 02-2335 (La.10/3/03), 855 So.2d 294. Because Es-cobar did not lodge a contemporaneous objection to the jury charges, he is not entitled to have this issue reviewed and considered by this Court.

Third Assignment of Error

In his third assignment of error, Escobar contends that the trial court erred *8 in imposing three consecutive life sentences.
The trial judge is afforded wide discretion in determining a sentence, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Jones, 98-1055, p. 3 (La.App. 5 Cir. 2/23/99), 729 So.2d 95, 97, citing State v. McCorkle, 97-966 (La.App. 5 Cir. 2/25/98), 708 So.2d 1212. In reviewing a sentence for excessiveness, the appellate court must consider the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice. | ,State v. Bowers, 99-416, p. 4 (La.App. 5 Cir. 9/28/99), 746 So.2d 82, 85.
In this case, Escobar only complains of the consecutive nature of his sentence. He contends that three consecutive life sentences for a non-shooting defendant who attempted to abort the crime is excessive. We note, however, that Escobar did not file a motion to reconsider the sentences imposed. In the past, this Court has held that when the consecutive nature of sentences is not specifically raised in the trial court, then the issue is not included in the bare constitutional excessive review, and the defendant is precluded from raising the issue on appeal. See State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11), 67 So.3d 535; see also, State v. Williams, 10-265, p. 7 (La.App. 5 Cir. 11/9/10), 54 So.3d 98, 103 (holding that the defendant was not entitled to a review of the consecutive nature of his sentences for failure to specifically object thereto.).
In this case, Escobar failed to file a motion to reconsider and failed to specifically object to the consecutive nature of his sentence. Therefore, he is not entitled to review of the consecutive nature of his sentences on this appeal.
Error Patent Discussion
We have reviewed the record for errors patent in conformity with La.C.Cr.P. art. 920. See State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
The commitment in this case reflects that Escobar was properly advised of the prescriptive period for filing post-conviction relief. The transcript, however, does not reflect that he was advised of such period.
In the past, this Court has ordered the trial court to properly advise defendant of the prescriptive period under LSA-C.Cr.P. art. 930.8 by written notice within ten days of the rendition of this Court’s opinion and then to file written proof in the record that defendant received the notice. However, in State v. Morris, 40,322 (La.App. 2 Cir. 1/25/06), 920 So.2d 359, 363, the Second Circuit corrected this error patent by way of its opinion rather than a remand.
|14State v. Davenport, 08-463, p. 11 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 457.
Accordingly, we hereby advise Escobar that pursuant to La.C.Cr.P. art. 930.8, no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. art. 914 or 922.
The convictions and sentences are affirmed.

AFFIRMED

. Gomez Bar was a neighborhood bar located on Fourth Street in Marrero, Louisiana. The bar, which also provided check cashing services, generally contained a lot of cash.

. Dep. Goff was not on duty when these events began to unfold.

. Brandi testified that she had met Navar-rete-Duran briefly the day before when she visited Escobar’s apartment. However, she • did not know Navarrete-Duran’s name.

. Garcia, Mario, Rigoberto, and Navarrete-Duran were also charged in the same indictment for second-degree murder. However, their cases were later severed, and the men were ordered to be tried separately.

. It was determined that Beauford Gomez was killed by a bullet fired from Wallace Gomez’s weapon.