STATE OF LOUISIANA

VERSUS

ELVIN D. VILLAFRANCA

NO. 18-KA-500

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 15-4323, DIVISION "J"
HONORABLE STEPHEN C. GREFER, JUDGE PRESIDING


November 27, 2019


**MARC E. JOHNSON**
**JUDGE**


Panel composed of Judges Jude G. Gravois,
Marc E. Johnson, and Hans J. Liljeberg


<u>**AFFIRMED; REMANDED WITH INSTRUCTIONS**</u>
**MEJ**
**JGG**
**HJL**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Paul D. Connick, Jr.
     Terry M. Boudreaux
     Anne M. Wallis
     Laura S. Schneidau
     Emily E. Booth

COUNSEL FOR DEFENDANT/APPELLANT,
ELVIN D. VILLAFRANCA
     Gwendolyn K. Brown

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA, DEPARTMENT OF JUSTICE
     Jeffrey M. Landry
     Colin Clark
     J. Taylor Gray

**JOHNSON, J.**

Defendant, Elvin D. Villafranca, appeals his convictions and sentences for attempted forcible rape and sexual battery of a juvenile under 13 years of age in the 24th Judicial District Court, Division "J". For the following reasons, the convictions and sentences are affirmed, and the matter is remanded to the trial court with instructions.

## FACTS AND PROCEDURAL HISTORY

On July 27, 2015, the Jefferson Parish District Attorney filed a bill of information charging Defendant and his wife, co-defendant Argentina Mesa, with various sex offenses committed against known juveniles. Specifically, Defendant was charged with forcible rape of a juvenile[1] (D.O.B. 8/29/2000) in violation of La. R.S. 14:42.1 (count one), sexual battery of a juvenile under 13 years of age (D.O.B. 5/27/2005) in violation of La. R.S. 14:43.1 (count three), and sexual battery of a juvenile under 13 years of age (D.O.B. 11/1/2007) in violation of La. R.S. 14:43.1 (count four).[2] Defendant pleaded not guilty to the charged offenses on August 13, 2015. Trial commenced before a 12-person jury on March 12, 2018.

### *Sexual Battery of D.V.*

At trial, Dr. Jaime Jackson, an expert in the field of pediatrics and child abuse pediatrics, testified that she worked at Children's Hospital of New Orleans in the Audrey Hepburn Care Center where she examined seven-year-old D.V. in November of 2014. Dr. Jackson identified the forensic referral filled out by D.V.'s mother who identified Defendant, his wife, co-defendant, Argentina Mesa, and a

---

[1] In the interest of protecting minor victims and victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), the judges of this Court have adopted a policy that this Court's published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (*i.e.*, parent, sibling, or relative with the same last name as the victim). *State v. Ross*, 14-84 (La. App. 5 Cir. 10/15/14); 182 So.3d 983, 985 n.3.

[2] Co-defendant Mesa was charged along with defendant in counts one and three and separately in count two with sexual battery of a juvenile (D.O.B. 8/29/2000) in violation of La. R.S. 14:43.1. Defendant and co-defendant were tried simultaneously.

man by the name of Marvin Avilla as the individuals she believed sexually abused her daughter. It was reported that D.V. was having trouble sleeping and was suffering from nightmares. During her interview with D.V., Dr. Jackson recalled that D.V. told her co-defendant Mesa touched her "PP area" with her fingernail, and that Defendant, who she referred to as "Vina-Vee," put his "PP" in her "PP, put his "PP" in her "poop-poop," and also touched her "PP" with his hand or fingers. She further recalled that "Vina-Vee" let his dog, Cosita, lick his "PP" and then grabbed her cheeks and tried to make her lick his "PP." D.V. recalled that "Vina-Vee" told her not to tell anyone about what happened.

D.V. also disclosed to Dr. Jackson similar allegations with regard to Marvin Avilla who she stated touched her on her "PP" and "poo-poo" with his hand and his tongue one time when she was at Mr. Avilla's house. She also stated that Mr. Avilla touched her "poo-poo" with his "PP inside" and also put his "PP" in her "PP." D.V. further explained to Dr. Jackson that Mr. Avilla forced her to watch videos on his phone about "someone's PP put to another PP." D.V. stated to Dr. Jackson that Mr. Avilla told her not to tell anyone, "even doctors." D.V. told Dr. Jackson that "he" also licked her breasts, which she called her "she-shes," with his tongue and "drank it." D.V. further told Dr. Jackson that she also almost licked Mr. Avilla's "PP" because he was forcing her head down but that he eventually let her go after "Flores," Mr. Avilla's girlfriend, came into the room.

A physical examination of D.V. was performed by Dr. Jackson who noted that a small adhesion was present on D.V.'s labia. Dr. Jackson explained that the adhesion could have been caused by many things among which included irritation or a healed injury. She further testified that D.V. was referred to the Family Justice Center for counseling.

Officer Brad Miller of the Gretna Police Department testified that his police department received a call from Children's Hospital on November 26, 2014, in

reference to a complaint of possible sexual abuse of a child. Defendant and Mr. Avilla were the suspected perpetrators identified. Due to the language barrier, D.V. and D.V.'s mother, C.C., were transported to the Gretna Police Department where the case was turned over to Detective Louis Alvarez.

Detective Alvarez testified that, with the aid of a translator, he spoke to C.C. who informed him that the alleged perpetrators of the sexual abuse against her daughter were her babysitters—Defendant and co-defendant Mesa—and Mr. Avilla who lived at a different residence than defendant and his wife who resided on Newton Street in Gretna, Louisiana. According to C.C., it was at the alleged perpetrators' homes where the sexual abuse occurred.[3]

Due to D.V.'s delayed reporting, which was "well over" a week, Detective Alvarez testified that he did not attempt to secure DNA from D.V. in helping to identify her assailants. Detective Alvarez explained that D.V. was taken to the Child Advocacy Center (CAC) for an interview. Brittany Bergeron conducted the interview with D.V. During the interview, D.V. told Ms. Bergeron that she was seven years old. She stated that Marvin and Elvin a/k/a "Vina-Vee" "are always touching and never stop." D.V. stated that Marvin "flipped" her shorts to the side and touched her "poo-poo with his pee-pee." She stated that Marvin stopped when "Flores," her babysitter, entered the room. She told Ms. Bergeron that Marvin warned her not to tell anyone. D.V. stated that Marvin also showed her videos about "someone putting his pee-pee to another pee-pee." With respect to Defendant, D.V. stated that Defendant touched the clothing of her "pee-pee" with his hands and also touched her "poo-poo." However, she could not remember "anymore" because her mom was "so upset."

After watching the CAC video, speaking with C.C., and reviewing D.V.'s

---

[3] Detective Alvarez testified that C.C. appeared concerned and worried when speaking about the crimes committed upon her daughter and did not appear to have coached D.V. in any way.

medical records from the Audrey Hepburn Care Center, Detective Alvarez

believed there to be three suspects: Defendant, co-defendant Mesa, and Mr. Avilla.

He also noted that D.V. made distinct and separate allegations of sexual abuse

against the male perpetrators—Defendant and Mr. Avilla—which were perpetrated

at their respective residences. Detective Alvarez acknowledged that while D.V.'s

CAC interview differed somewhat from the medical records he reviewed, he

explained that such differences are not uncommon in his experience investigating

sexual offenses involving minors.[4] Defendant and co-defendant Mesa were

arrested[5] and Detective Brandon LeBlanc took over the case.

C.C. testified with the aid of an interpreter that she came to the United States

from Honduras in 2005 on a work permit. C.C. lost her documentation, allowing

her to remain in the United States during Hurricane Katrina and testified that she

never reapplied for the proper documentation which would allow her to remain in

the States. She explained that D.V. was born on November 1, 2007, and that her

youngest daughter, A.V., was born on December 18, 2008. C.C. testified that she

has family in Louisiana and was working in housekeeping and as a cashier. She

testified that due to her work schedule, co-defendant Mesa, a close family friend,

babysat her children at co-defendant's home beginning when D.V. was four years

old. She testified that co-defendant Mesa was married to Defendant and that her

children referred to Defendant as "Vina-Vee." She recalled that co-defendant

Mesa stopped babysitting her children in October of 2014 because they were

"crying a lot." At that time, C.C. also used another babysitter by the name of

---

[4] Detective Alvarez explained that in the interview at the Audrey Hepburn Care Center, D.V. stated that defendant touched her with his "pee-pee," and in the CAC interview D.V. stated that Defendant touched her with his hand. However, Detective Alvarez explained that the questions asked at the Audrey Hepburn Care Center are more direct and to the point, whereas those asked during CAC interviews are not.

[5] Mr. Avilla's case is currently an open investigation with the Gretna Police Department pending the obtaining of additional electronic communications evidence. Detective Alvarez explained that allegations were made by D.V. regarding pornographic material observed on Mr. Avilla's phone and that extraction of Mr. Avilla's phone has confirmed that it contained pornography.

"Flores" to look after her children to "see if they stopped crying."

On D.V.'s seventh birthday, November 1, 2014, C.C. recalled that D.V. received a tablet as a gift. C.C. testified that a few days later she looked at D.V.'s tablet and discovered that D.V. had googled, several times, "kisses between a girl and boy." When D.V. returned from school C.C. spoke to her about her findings. She recalled that D.V. was trembling and appeared scared. D.V. told her mother that "Marvin showed me." C.C. did not know who Marvin was, but later learned it was Flores' boyfriend, who lived a block from Defendant and co-defendant Mesa. C.C. then inquired of D.V. as to whether anything bad had "happened to her in any other place or in another house," to which she stated that "something had happened" at Defendant and co-defendant Mesa's house. According to C.C., D.V. told her that co-defendant Mesa "had red fingernails and that she used to put her finger in the middle of her pee-pee and that she was trying to arouse her." D.V. told her mother that Defendant was there when it happened and also confessed that Defendant "used to touch her inappropriately."

After learning of this information, C.C. called D.V.'s pediatrician who told her to take D.V. to Children's Hospital. C.C. testified that while at the hospital she was contacted by the police, which frightened her because she thought they were going to take her daughters away. She stated that she blamed herself for not being able to watch her own children because she had to work. C.C. explained that she and D.V. were interviewed at the Gretna Police Department where it was arranged for D.V. to speak with someone at the CAC. C.C. denied ever telling D.V. what to say about the sexual abuse and confessed that when D.V. tried to speak with her about what Defendant or co-defendant Mesa did to her, it was very hard to hear, so she would tell D.V. to "forget about it and let Jesus take that away and bring . . . good stuff."

C.C. further testified that when she discovered what had happened with her

daughter, she contacted other relatives who had also been to co-defendant Mesa's house including a teenaged cousin, J.C. It was then that J.C. informed her "something had happened to her" while at Defendant and co-defendant's house.[6] C.C. offered to help J.C. knowing her mother and father were in Honduras, and J.C. agreed to go to the police. C.C. testified that she did not tell J.C. about what had happened to D.V. because it was "very hard" for her, and she did not want J.C. to "feel guilty for anything that had happened" to D.V.

C.C. stated that after Defendant and co-defendant Mesa were arrested she was contacted by a former co-worker, G.V., who had also left her child, S.B., in the care of the defendants. She testified that during her conversation with G.V. she did not tell her about what had happened to D.V. but that after speaking with G.V., she advised her that she could take her daughter S.B. to Children's Hospital if she "wanted to know if something had happened to her."

C.C. explained that she and D.V. were referred to the Family Justice Center for counseling, and through the justice center, C.C. was put in touch with an immigration attorney. She testified that her attorney spoke to her about obtaining a U-Visa, which she understood to be a temporary permit issued to family members of domestic violence or sexual abuse which allows them to remain in the United States for three to five years.

Ten-year-old D.V. testified at trial that three people "did bad stuff to" her like "touching [her] private parts." She identified Defendant, co-defendant Mesa, and "Marvin" as the three people. D.V. stated that when she was approximately six years old, while at her babysitter's (co-defendant Mesa) house, co-defendant Mesa put her fingernails in her "private part," which she referred to as her "pee-pee." D.V. further testified that Defendant used to try to make her "touch his

---

[6] According to C.C., J.C. never divulged the details of what happened to her while at Defendant and co-defendant Mesa's home.

private parts and stuff." She explained that one time while in Defendant's room, Defendant was lying on the bed and let his dog lick his "private part."[7] He then tried to make her "lick his private part" by pushing her head into his "private part." D.V. asserted that neither her head nor mouth ever actually touched Defendant's private part because she was "pushing" back. D.V. also stated that one time while she and Defendant were in the kitchen, Defendant had his pants down and grabbed her hand and started rubbing her hand on his "private part." Another time, D.V. recalled that Defendant grabbed her, pulled down her shirt, and "was licking [her] she-shes." D.V. indicated that her "she-shes" are her breasts.

D.V. then testified regarding the sexual abuse committed upon her by Marvin, who she stated put his "private part" in her "bottom," and licked her "private part." She further stated that he forced her to watch "videos" on his phone. D.V. explained that when discussing these instances of abuse, she was originally confused as to who had done what to her, noting that she mixed up what Defendant and Marvin did, but stated that she later corrected herself. She testified that everything she testified to at trial was the truth. D.V. further confirmed that she never spoke to J.C. or S.B. about the acts of sexual abuse committed upon her by Defendant and co-defendant Mesa.

### Forcible Rape of J.C.

On March 26, 2015, Officer Duston Costa of the Gretna Police Department met with C.C. and 15-year-old J.C., who were requesting to make a complaint regarding a possible rape. He explained that J.C. had confided in C.C. that sometime in November of 2013, she went over to Defendant's house and was the victim of rape and a sexual assault by Defendant and co-defendant Mesa. According to Officer Costa, J.C. relayed to him that co-defendant Mesa had served her alcohol while in their home that day.

---

[7] D.V. indicated for the jury that his "private part" was located in the front lap area.

Detective LeBlanc was working for the Gretna Police Department when J.C. and C.C. came into the police department to file the report. J.C. explained to Detective LeBlanc that in November of 2013, when she was 13 years old, she was at Defendant's home on Newton Street when the incident occurred. J.C. further identified an individual by the name of S.B. as a potential witness to part of the incident. After obtaining J.C.'s statement, he referred her to the CAC where an interview was conducted which was consistent with the information J.C. had provided to Detective LeBlanc. Warrants were then prepared for the arrest of Defendant and co-defendant. Pursuant to arrest warrants, Defendant and co-defendant were arrested on additional charges and advised of their rights. Defendant and co-defendant Mesa were transported to the Gretna Police Department, where they agreed to provide statements. During the interview with co-defendant Mesa, she admitted to watching J.C. at her home, but then, according to Detective LeBlanc, spent the majority of the interview "trying to slander [J.C.'s] name." During his interview with Defendant, he told Detective LeBlanc that co-defendant Mesa would babysit children at their residence, naming several children, except for the victims in this case until specifically asked. However, neither Defendant nor co-defendant Mesa made any inculpatory statements during their interviews.

Anne Troy, forensic nurse practitioner at the Audrey Hepburn Care Center and expert family nurse practitioner specializing in the maltreatment of children, testified that she met with J.C. on April 6, 2015. Ms. Troy's first impression of J.C. was that she had a very chaotic life filled with neglect, lack of supervision, and emotional and physical abuse. Ms. Troy further explained that J.C. possessed all the risk factors for being a child vulnerable to abuse. She explained that those who are targeted for sexual abuse have often already been labeled a liar, troublemaker,

or drug user. Ms. Troy noted that when she met with J.C., J.C. was 14 years old, had recently had a baby, and had been running away from home.

In Ms. Troy's opinion, J.C. provided a clear and detailed spontaneous history of sexual abuse. She told Ms. Troy that Defendant picked her up one day at her grandmother's house and brought her to his house. She told Ms. Troy that S.B. was there but was in another room watching television because she was not permitted to watch the show they were watching. J.C. explained to Ms. Troy that Defendant asked her if she wanted something to drink, and she requested a soda; but instead, he brought her a glass cup filled with a clear liquid. She stated the drink burned her throat and she knew it had to be alcohol. When she confronted Defendant about it, she stated that he laughed and brought her another drink. J.C. told Ms. Troy that she threatened to leave, but co-defendant Mesa questioned her as to how she was going to get home. J.C. recounted that she tried to go back to the room where S.B. was watching television when Defendant grabbed her and brought her into his room. J.C. stated that Defendant threw her on the bed, opened her legs, and penetrated her vagina. She stated that she was crying and when he was done he left the room, and co-defendant Mesa came into the room and started touching her inside her vagina with her finger. She told Ms. Troy that co-defendant Mesa told her to stop crying "because you know you liked it." It was then that J.C. got up and ran to S.B.'s room, where she attempted to tell S.B. what had happened but recalled that S.B. did not believe her because Defendant and co-defendant had told S.B. that she was drunk.

J.C. explained to Ms. Troy that she again tried to leave but had no way of getting home, so she fell asleep by the front door. The next day, Defendant dropped J.C. off at her house and told her not to tell anyone because "something would happen to" her. She reported that she told C.C. what had happened after C.C. called her and asked her if anything had happened with the defendants

18-KA-500                                    9

because something had happened with her daughter, D.V., and she knew J.C. would often visit Defendant's home.

At trial, seventeen-year-old J.C. testified that she was originally born in Honduras and came to the United States with her grandmother and mother when she was one and one-half years old. She explained that she was nine years old when her mother was deported, so she lived with her grandmother. J.C. testified that her grandfather would hit her, so she often times stayed elsewhere. J.C. further testified that she was living with her boyfriend and her two children.

J.C. testified that she was ten years old when she met co-defendant Mesa at her grandmother's house. She recalled that she was very close with co-defendant Mesa and often slept over at her house. On occasion she would bring S.B. with her to Defendant's house, explaining that her grandmother used to watch S.B. J.C. further recalled a time when she and S.B. stayed at Defendant's house for a week in November of 2012 or 2013 when she was 12 or 13 years old. One night during that week, when Defendant arrived home from work "drunk," S.B. was sent to her room because she was not old enough to watch the show that was on television due to its mature content. J.C. explained that she was sitting on the sofa with co-defendant Mesa when Defendant asked J.C. if she wanted a drink and was handed something "clear and bubbly." J.C. informed him that she was not old enough to drink, but after encouragement by Defendant and co-defendant, she drank what was given to her. Defendant then poured J.C. another glass and began laughing at J.C., stating "it's fine. It won't do you anything." J.C. explained that she began to feel ill and tried to go back to her bedroom but was brought back to the living room by co-defendant Mesa. J.C. and co-defendant Mesa got into an argument because she wanted J.C. to continue drinking and later pushed J.C.

Defendant then forced J.C. into Defendant's bedroom, refusing to let J.C. leave. J.C. asked co-defendant Mesa to help her, but she refused. She testified that

she was wearing the nightgown co-defendant Mesa had bought her, explaining that she used to wear pajama pants, but co-defendant Mesa told her "girls wear nightgowns" and instructed her to wear it that night. J.C. testified that Defendant pushed her onto the bed, got on top of her, and vaginally raped her. J.C. stated that when she resisted, Defendant hit her and told her to "shut up."

When it was over, Defendant left the room, and co-defendant Mesa came into the bedroom and started touching J.C.'s legs and then digitally penetrated J.C.'s vagina, telling J.C. that she liked it, and "needed to learn." J.C. testified that she got up crying and ran into S.B.'s room and told her they had to leave. J.C. stated that she told S.B. what had happened, but that S.B. did not believe her because Defendant and co-defendant had told S.B. she was drunk. J.C. recalled that she became ill and vomited in the kitchen sink. She testified that co-defendant Mesa followed her and told her that she was "stupid," and had to listen to her because "she knew what was best for" her and that if she gave Defendant a baby, he would give her anything she wanted.

J.C. tried to leave the house but did not have a cellphone or a car. J.C. testified that she fell asleep by the door and when she woke up she went back to the bed where S.B. was sleeping and fell asleep until the next morning. When J.C. and S.B. awoke, S.B. asked J.C. what had happened and why she had been drinking. J.C. tried to explain to S.B. that she does not drink, but S.B. again did not believe her. Later, the defendants dropped J.C. off at her house and threatened that if she said anything about what happened, their family members in Honduras would "do something" to her family in Honduras. She explained that she did not tell anyone what had happened to her until her cousin, C.C., called her. J.C. stated that C.C. advised her to tell the police if something bad had happened. J.C. agreed

and reported the rape to the police.[8]  While at the police station, J.C. stated that she overheard a conversation between the officers and C.C. regarding D.V., which was the first time she had learned of what had happened to D.V.  J.C. further testified that S.B. eventually disclosed to her that something had also happened to her while at Defendant's house, and J.C. advised S.B. to tell her mother.[9]

J.C. testified that she is in therapy as a result of the rape and stated that she was referred to a lawyer who informed her of the possibility of obtaining a U-Visa.

***Sexual Battery of S.B.***

After the defendants were arrested, C.C. contacted Detective LeBlanc about another victim, S.B.,[10] whom she stated also had a complaint to lodge against Defendant and co-defendant.  Detective LeBlanc met with S.B., who asserted that in August of 2014 she too had been the victim of a sex crime and had already been to the Audrey Hepburn Care Center for evaluation.  A forensic interview was arranged for S.B. at the CAC and warrants for Defendant and co-defendant's arrests on charges of sexual battery were executed.

During her interview at the CAC on May 6, 2015, nine-year-old S.B. told Erika Dupepe that one day when co-defendant Mesa was babysitting her at Defendant's house, she took a shower, got dressed, and fell asleep in Defendant's bed.  She stated that when she woke up Defendant was "touching" her on the inside of her "private part" with his hand.  She told Ms. Dupepe that she told Defendant to stop and that he responded, "that's something you're going to have to do when you're older."  S.B. recalled that co-defendant Mesa then came into the room and "said the same thing."  When S.B. asked co-defendant Mesa to "do

---

[8] J.C. was presented a photographic lineup while at the police station and identified Defendant as the perpetrator of the rape.  At trial, J.C. identified co-defendant Mesa in open court but stated that she did not see Defendant.

[9] Erika Dupepe of the CAC conducted the interview with J.C. on March 27, 2015.  J.C. testified at trial consistently with her interview with Ms. Dupepe as to the rape.

[10] It is noted that in some places of the record, S.B.'s first name is spelled with a Z, rather than an S.

something about" Defendant, co-defendant Mesa threatened her, advising her not to tell anyone what had happened. She also told Ms. Dupepe about a time while at Defendant's home when J.C. was given alcohol. She stated that J.C. got dizzy and "blacked out." S.B. recalled that she later went to sleep next to J.C., but when she awoke, J.C. was not in the bed. She stated that she could hear J.C. screaming from Defendant's room. When she asked co-defendant Mesa what was happening, co-defendant stated "don't mind." S.B. told Ms. Dupepe that she could hear J.C. say, "no, I'm still a little girl."

Ms. Troy also met with S.B. on April 8, 2015, at the Audrey Hepburn Care Center when S.B. was nine years old. Upon her physical examination of S.B., Ms. Troy noted S.B. had a labial adhesion, which she testified was "non-specific," explaining that it could have been obtained based on a multitude of reasons, one of which could have been sexual abuse. Ms. Troy also testified that she treated S.B. for a urinary tract infection, which may or may not have been caused by sexual abuse.

S.B. also provided a detailed history to Ms. Troy during which she told Ms. Troy that, approximately one year prior to their meeting, she was at Defendant's house. After taking a shower, she went into Defendant's room to change when Defendant came into the room and touched her on her "private part" with his hand. She stated that co-defendant Mesa was watching Defendant touch her. S.B. told Defendant to stop, but he ignored her and asked her if she "liked it." When S.B. told him no, he stated, "well, you're going to have to like it because one day you're going to have to do it." Co-defendant Mesa also told S.B. to "get comfortable with it."

She also relayed to Ms. Troy that one time when she was sleeping, Defendant and co-defendant came into the room. She recalled that Defendant was naked and co-defendant Mesa forced her to touch defendant's "private part" by

grabbing her hand and placing it on his "private part." S.B. stated that she threatened to tell her mother so co-defendant Mesa stopped. She later told her mother that Defendant was touching her "without any supervision."

S.B. also told Ms. Troy about a time when J.C. was over at Defendant's house, and Defendant gave J.C. alcohol and then brought her into his room where they were naked on the bed. However, S.B. stated that she was not present for the incident involving J.C. Based on her discussions with S.B., Ms. Troy concluded that the information provided was consistent with the allegations of sexual abuse committed upon S.B., noting that S.B. provided a clear and detailed spontaneous history of sexual abuse.

G.V., S.B.'s mother, testified that her daughter S.B. was born on May 28, 2005. She confirmed that she is originally from Honduras and that she entered the United States illegally. G.V. testified that she met co-defendant Mesa at her previous place of employment. She explained that co-defendant Mesa would take care of S.B. and that S.B. would stay overnight at Defendant's house on occasion. She recalled that when Defendant and co-defendant were arrested, she contacted C.C., a former co-worker whom she knew had gone through a similar situation and asked where she could take S.B. to have her "checked." C.C. informed G.V. of the Audrey Hepburn Care Center and told her that something had also happened to her daughter D.V. G.V. explained that she brought S.B. to the care center for evaluation and was also referred to the Family Justice Center where she was introduced to an immigration attorney who assisted her in filling out paperwork for a U-Visa.

Lieutenant Grey Thurman of the Gretna Police Department explained that a U-Visa is an application made through the Department of Homeland Security to authorize temporary citizenship to certain victims or family members of certain crimes. Lieutenant Thurman signed the U-Visa certification for J.C., G.V., and

C.C.'s applications, verifying that a crime had in fact occurred.

S.B. testified that she was born on May 27, 2005. S.B. testified that co-defendant Mesa was her babysitter and that she started going to her house when she was six months of age until 2015. She explained that she had a strong bond with Defendant and co-defendant until the "incident," after which she stopped going to Defendant's house. S.B. testified that on one occasion when she was eight or nine years old, she was sleeping in Defendant's bed when she woke up to find Defendant touching her on the outside of her vagina. S.B. stated that she tried to stop him by kicking and punching him but that he held her hands down. S.B. testified that co-defendant Mesa walked into the room and saw what was going on but did nothing to stop it, instead, co-defendant Mesa told S.B. "stop trying to stop it because you are going to have to do it anyway when you get older."

On another occasion, S.B. recalled that she was at Defendant's house in their bed when co-defendant Mesa grabbed her hand and put it on Defendant's penis. S.B. testified that she tried to resist when co-defendant Mesa asked her "why won't you touch it?" According to S.B., co-defendant Mesa eventually stopped after S.B. threatened to tell her mother. S.B. recalled that she originally denied that anything had happened to her when questioned by J.C. because she was afraid but later confessed to J.C. and her mother that "something did happen."[11] She testified that the defendants threatened to hurt anyone she told.[12]

On March 20, 2018, the jury returned a responsive verdict of guilty of

---

[11] S.B. also recalled a time when she was seven or eight years old, and she observed J.C. drink out of a bottle and start "acting different." She explained that she was sitting on the couch watching a movie when defendant came home from work and offered J.C. a drink. Defendant then returned with a green bottle, which J.C. drank causing her to feel dizzy and fall asleep. She recalled that Defendant took J.C. into his bedroom and testified that she could hear yelling while in the living room. When she asked co-defendant Mesa what was going on, she told her "not to pay any mind." She testified that she did not spend the night at Defendant's house that night, and she did not see co-defendant Mesa go into the bedroom.

[12] Character witnesses, Eleazar Bueso and Tulio Garcia, the pastor and assistant pastor at the church where Defendant and co-defendant are members, testified that both Defendant and co-defendant have a good reputation in their church community. Celia Escobar, a friend of Defendant and co-defendant, also testified regarding their good reputation.

attempted forcible rape on count one and guilty as charged on counts three and four. On April 16, 2018, the trial court denied Defendant's motion for post-verdict judgment of acquittal and motion for new trial. On the same date, after a waiver of sentencing delays, the trial court sentenced Defendant on count one, attempted forcible rape, to ten years imprisonment in the Department of Corrections,[13] and on each of counts three and four, sexual battery of a juvenile under 13 years of age, to 25 years imprisonment. The trial court further ordered the sentences imposed on each count to be served without benefit of probation, parole, or suspension of sentence and ordered that they be served consecutively to one another. The court also recommended Defendant for drug treatment and any self-help programs suitable to the Department of Corrections.

Immediately following the imposition of Defendant's sentences, the trial court denied Defendant's motion to reconsider sentence filed on the same date.[14] Also on the same date of his sentencing, Defendant filed a motion for appeal, which the trial court granted on April 18, 2018.[15] The instant appeal followed.

## ASSIGNMENTS OF ERROR

On appeal, Defendant alleges: 1) the record is insufficient to preserve his right to appellate review; 2) the trial court erred by finding one of the victims, D.V., competent to testify; 3) the trial court erred by denying his motion for mistrial; 4) the evidence is insufficient to support his convictions; 5) the verdicts are presumptively non-unanimous and, as such, should not be permitted to stand;

---

[13] Although the trial court did not state that Defendant's sentence on count one was to be served at hard labor, "a sentence committing a prisoner to the Department of Corrections is necessarily at hard labor." *State v. Lawson*, 04-334 (La. App. 5 Cir. 9/28/04); 885 So.2d 618 (citing *State v. Lisenby*, 534 So.2d 996, 998 (La. App. 3 Cir.1988)).

[14] Defendant filed his motion for reconsideration of sentence prior to imposition of his sentences. An objection to a sentence or a motion to reconsider sentence filed before the sentence is imposed is premature. *State v. Hunter*, 10-552 (La. App. 5 Cir. 1/11/11); 59 So.3d 1270, 1273. Nevertheless, it was properly ruled upon after sentencing.

[15] A review of the sentencing transcript indicates that Defendant filed his motion for appeal prior to the imposition of his sentences, which was then granted after sentencing. However, a premature appeal need not be dismissed when a sentence is imposed after the motion for appeal is filed. *See State v. Proctor*, 04-1114 (La. App. 5 Cir. 3/29/05); 901 So.2d 477, 484 n.4.

and 6) the sentences are excessive.

## LAW AND ANALYSIS

Sufficiency of Evidence[16]

In this assignment of error, Defendant argues the evidence is insufficient to support his convictions. He submits that the allegations of the victims were so fraught with internal inconsistencies, inconsistencies with prior statements, inconsistencies with objective evidence from other sources, and were motivated by self-serving interests so as to be wholly lacking in credibility such that their testimonies were erroneously accepted by the jury. Defendant further avers that the evidence is insufficient with regard to count three, as the State failed to prove the essential element of identity of the victim.

In response, the State submits the evidence is sufficient to support the convictions in this case. It asserts the jury heard the alleged inconsistencies and chose to reject them, finding the victims' testimonies credible. The State further contends that, with respect to the identification of the victim in count three, the record established that the victim was born in 2005 and that the crime occurred in 2014, supporting the charge and conviction that it was S.B. who was sexually abused by defendant. Accordingly, after viewing the evidence in the light most favorable to the prosecution, the State maintains that it proved the essential elements of the crimes committed by defendant against the victims in this case beyond a reasonable doubt.

In reviewing the sufficiency of evidence, an appellate court must determine

---

[16] When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. *Id*. Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial. *Id*. Therefore, the sufficiency of the evidence is addressed before Defendant's other assignments. *See also State v. Nguyen*, 05-569 (La. App. 5 Cir. 2/3/06); 924 So.2d 258, 262.

that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Neal*, 00-0674 (La. 6/29/01); 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09); 15 So.3d 198, 202, *writ denied*, 09-1305 (La. 2/5/10); 27 So.3d 297. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *Id.* Indeed, a reviewing court errs by substituting its appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *See State v. Calloway*, 07-2306 (La. 1/21/09); 1 So.3d 417, 418. As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at the trial established guilt beyond a reasonable doubt, but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *State v. Jones*, 08-20 (La. App. 5 Cir. 4/15/08); 985 So.2d 234, 240.

In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *Caffrey, supra.* Indeed, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *See State v. Bailey*, 04-85 (La. App. 5 Cir. 5/26/04); 875 So.2d 949, 955, *writ denied*, 04-1605

(La. 11/15/04); 887 So.2d 476, *cert. denied*, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Dixon*, 07-915 (La. App. 5 Cir. 3/11/08); 982 So.2d 146, 153, *writ denied*, 08-0987 (La. 1/30/09); 999 So.2d 745. Moreover, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. *State v. Bruce*, 14-877 (La. App. 5 Cir. 3/25/15); 169 So.3d 671, 675, *writ denied*, 15-833 (La. 3/4/16); 187 So.3d 1007.

In the case at bar, Defendant was convicted of attempted forcible rape of a known juvenile, J.C., in violation of La. R.S. 14:27 and La. R.S. 14:42.1 (count one)[17] and two counts of sexual battery of two known juveniles, S.B. and D.V., who were under the age of thirteen, in violation of La. R.S. 14:43.1 (counts three and four).[18]

*Attempted forcible Rape of J.C. (count one)*

With respect to Defendant's attempted forcible rape conviction, he was charged with forcible rape but was found guilty of the responsive verdict of attempted forcible rape, in violation of La. R.S. 14:27 and La. R.S. 14:42.1. When a defendant does not object to a legislatively responsive verdict, the defendant's conviction will not be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. *State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 252 (La. 1982), *cert. denied*, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983); *State v. Austin*, 04-993 (La. App. 5

---

[17] It was alleged that this offense was committed on or between November 1, 2013 and November 30, 2013.

[18] It was alleged that the sexual battery of S.B. occurred on or between August 1, 2014 and August 30, 2014, and that the sexual battery of D.V. occurred on or between November 1, 2013 and November 26, 2014.

Cir. 3/1/05); 900 So.2d 867, 878, *writ denied*, 05-0830 (La. 11/28/05); 916 So.2d 143. In the present case, Defendant did not lodge an objection to the responsive verdicts, which included attempted forcible rape. Accordingly, Defendant is entitled to a reversal of his conviction if the evidence is insufficient to support a conviction of the charged offense, forcible rape, or attempted forcible rape.

Forcible rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape. La. R.S. 14:42.1(A)(1). Rape is defined by La. R.S. 14:41, in pertinent part, as "the act of vaginal sexual intercourse with a male or female person committed without the person's lawful consent; emission is not necessary, and sexual penetration, however slight, is sufficient to complete the crime."

Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward accomplishing of his object is guilty of an attempt to commit the offense intended. La. R.S. 14:27. To support a conviction for attempted forcible rape, the State must prove that the defendant had the specific intent to commit forcible rape and that he did an act for the purpose of, and tending directly toward, the accomplishing of his objective. La. R.S. 14:27; La. R.S. 14:42.1; *State v. Dorsey*, 30-683 (La. App. 2 Cir. 6/24/98); 718 So.2d 466, *writ denied*, 98-2227 (La. 12/18/98); 732 So.2d 54. Specific intent need not be proven as a fact but may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Graham*, 420 So.2d 1126, 1127 (La. 1982).

Seventeen-year-old J.C. testified at trial that, over the Thanksgiving holiday in November of 2012 or 2013, when she was approximately 13 years old, she spent

the night at Defendant's house.[19]  On that particular night, she recalled that Defendant served her alcohol, which she was pressured into drinking.  J.C. testified that she began to feel ill and attempted to return to the bedroom where she slept; however, she was forced by Defendant into his bedroom and pushed onto the bed, where Defendant then got on top of her and vaginally raped her.  She testified that when she resisted, Defendant hit her and told her to "shut up."

Defendant contends J.C.'s claims against him were motivated by C.C., who assisted her in lodging her complaint and thereby placed J.C. in the position to obtain a U-Visa which, as a victim of sexual abuse, would secure her mother's return to the United States.  He further maintains J.C.'s claims were "bizarre" in that she testified regarding her close relationship with Defendant and his wife, but then, "out of nowhere," she was vaginally raped by Defendant.  He asserts that J.C.'s testimony changed several times as to whether he hit her before or during the rape, whether the door was opened or closed, and how many alcoholic beverages he gave her.  Defendant also maintains that J.C.'s trial testimony was inconsistent with her CAC statement as to whether J.C. attempted to call her mother after the rape, and whether co-defendant Mesa hit her as well.  Defendant concludes these inconsistencies, coupled with the fact that J.C. and co-defendant Mesa remained close even after the alleged rape, establish that no rational trier of fact could have found him guilty of attempted forcible rape.

First, it is well-settled that a victim's testimony alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense.  *Bruce*, *supra*.  Second, testimony need not be uncontradicted to support a conviction.  The resolution of conflicting or contradictory testimony is one of the

_____

[19] The record reflects Defendant's date of birth is February 28, 1978, making him 35 years old at the time of the offense.

fundamental tasks for the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *See Bailey, supra.* Third, the alleged inconsistencies in J.C.'s recollection of the events do not render her testimony insufficient to support Defendant's attempted forcible rape conviction, as they are not irreconcilably inconsistent with her testimony that Defendant forcibly raped her. Further, a reasonable jury could have found that the various inconsistencies, which concern matters tangential to the act of rape, could be due to the victim's young age and the traumatic experience she endured. *See State v. Alexander*, 12-194 (La. App. 5 Cir. 5/16/13); 119 So.3d 120, 128, *writ denied*, 13-1337 (La. 12/6/13); 129 So.3d 529. And fourth, while J.C.'s alleged inconsistencies may be reason to doubt her version of the events, the jury was tasked with weighing the evidence, including Defendant's theory of innocence regarding any alleged motivation by J.C. to obtain a U-Visa to secure her mother's return to the United States, and made its credibility determination when it returned a responsive verdict of attempted forcible rape, evidently finding J.C.'s version of events more credible than Defendant's theory of fabrication. It is the fact-finder who weighs the respective credibility of the witnesses, and this Court will not second-guess those determinations. *State v. Smith*, 94-3116 (La. 10/16/95); 661 So.2d 442, 443.

Accordingly, we find J.C.'s testimony that Defendant served her alcohol, forced her into his bedroom, pushed her onto the bed, vaginally raped her and hit her when she tried to resist was sufficient to convince a rational trier of fact beyond a reasonable doubt that Defendant was guilty of the charged offense of forcible rape. (*See Alexander, supra*, where the defendant was charged with forcible rape but found guilty of the responsive verdict of attempted forcible rape. On appeal, the defendant argued the victim's inconsistent statements and lack of physical evidence rendered the evidence insufficient to find him guilty of attempted forcible rape. This Court found that while the victim may have been inconsistent in some

details surrounding the incident, her descriptions of the pertinent events—namely, the inappropriate touching and penile-vaginal penetration—were consistent. Thus, this Court held the evidence presented was sufficient to have found the defendant guilty of forcible rape; *See also*, State *v. Carter*, 04-482 (La. App. 5 Cir. 10/26/04); 888 So.2d 928, 934-35, where this Court upheld the defendant's conviction for forcible rape and found the evidence of the element of force was sufficient where the victim, who was 14 years old at the time of the incident, testified at trial that the defendant, an adult who was larger and stronger than her, picked her up out of the bed and carried her to his bedroom, despite her verbal protests. She further testified that the defendant pushed her into a reclining position on his bed and pinned both of her hands behind her back. When she tried to free her hands, the defendant gripped them tighter. The victim also testified at trial that the defendant put his penis into her vagina).

*Sexual Battery of S.B. and D.V. (Counts three and four)*

As for Defendant's convictions for sexual battery of two juveniles under the age of thirteen, at the time of the offenses, La. R.S. 14:43.1 provided, in pertinent part:

> A. Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, when any of the following occur:
>
> . . .
>
> (2) The act is consensual but the other person, who is not the spouse of the offender, has not yet attained fifteen years of age and is at least three years younger than the offender.

At trial, D.V. testified that when she was approximately six years old, she was at Defendant's house when co-defendant Mesa put her "fingernails" in her "pee-pee." She further testified that Defendant used to try to make her "touch his private parts." One time after D.V. observed Defendant's dog licking Defendant's

"private part," he tried to make her "lick his private part," by pushing her head into his "private part." D.V. explained that she resisted and confirmed that her mouth never actually touched Defendant's "private part." However, D.V. recalled a time when she was in the kitchen and Defendant grabbed her hand and rubbed it on his "private part" and another time when Defendant pulled down her shirt and licked her breasts. D.V. also testified regarding the sexual abuse committed upon her by Mr. Avilla, who she stated put his "private part" in her "bottom," licked her "private part," and forced her to watch "videos" on his phone.

Meanwhile, S.B. testified that she was born on May 27, 2005. She recalled that when she was eight or nine years old, in August before her fourth-grade year, she was sleeping in Defendant's bed when she woke up to find Defendant touching her on the outside of her vagina. She recalled that Defendant held her hands down, and co-defendant Mesa did nothing to stop him. S.B. further testified that on another occasion, while at Defendant's house in their bed, co-defendant Mesa grabbed her hand and forced her to touch Defendant's penis.

Defendant avers the same theories with respect to S.B. and D.V. as he does against J.C. as it pertains to the motivation behind their sexual abuse allegations. Namely, he suggests that S.B. and D.V. manufactured their claims, with the aid of their mothers, in order to obtain U-Visas for themselves and their family members. In further support of his theory of fabrication, Defendant cites to D.V.'s use of the words "arouse" and "inappropriate," words which he claims D.V. lacked an understanding of their meaning. Defendant also contends that D.V. and S.B.'s complaints were materially inconsistent with the accounts they gave in their CAC and/or Audrey Hepburn Care Center interviews and further were internally inconsistent and implausible.

Additionally, with respect to D.V., Defendant avers that she testified at trial to three sexual abuse allegations against him: (1) when Defendant tried to make her

lick his "private part"; (2) when Defendant put her hand on his "private part"; and (3) when Defendant licked her breasts. However, he notes that in her interview at the CAC and the Audrey Hepburn Care Center, D.V. also alleged Defendant touched her "private part" with his "pee-pee" and with his hand.

Defendant argues that the elements of the offense, as it relates to the sexual battery of D.V., were not met; rather, he claims D.V.'s inconsistent trial testimony, along with the statements she previously made, warrant reversal of his sexual battery conviction. While it is true that D.V.'s testimony at trial differs in some respects from the sexual abuse allegations relayed during her previous interviews at the CAC and Audrey Hepburn Care Center, there are also several consistencies. For example, D.V. was consistent in her account of the incident between herself and Defendant when he attempted to force her to lick his "private part." While she failed to identify whether Defendant or Mr. Avilla licked her breasts, merely stating "he" during her interview with Dr. Jackson, she did discuss the encounter in great detail.

Additionally, when questioned at trial regarding her varying accounts, D.V. explained that when originally speaking about the instances of abuse committed upon her by Defendant, she was confused as to who had done what to her, having blended the acts of sexual abuse committed by Defendant and Mr. Avilla, but later corrected herself and confirmed that everything she testified to at trial was the truth. Expert witness, Dr. Jamie Jackson, specializing in child abuse pediatrics testified that due to the number of perpetrators in this case and D.V.'s young age, it was difficult for D.V. to keep track of who did what to her and when. Ann Troy, an expert specializing in the maltreatment of children, also explained that perceived inconsistencies in a child's reporting of sexual abuse might be the result of a "blended" history, noting that a child's reporting does not always sound the same. This Court has recognized that expert testimony can assist a jury in

understanding the significance of a child-witness's demeanor, inconsistent reports, delayed disclosure, and recantation. *State v. Myles*, 04-434 (La. App. 5 Cir. 10/12/04); 887 So.2d 118, 125. An expert witness can explain to the jury that a child-witness's seemingly abnormal behavior (such as delayed reporting, inconsistent statements, and recantation) is normal for children who have been sexually abused and can also dispel jurors inaccurate perceptions allowing them to better assess a child-witness's testimony. *Id.*

Here, the jury was fully aware of and repeatedly presented with alleged inconsistencies in D.V.'s testimony, which were emphasized by defense counsel throughout the trial. During trial, Defendant also brought to light D.V.'s use of the words "arouse" and "inappropriate," suggesting to the jury that D.V. was "coached" by her mother; however, the jury still found D.V.'s testimony to be credible and found Defendant guilty of sexual battery of D.V. It is the province of the trier of fact, not this Court, to evaluate the credibility of witnesses and weigh the evidence. *State v. Rogers*, 16-14 (La. App. 5 Cir. 10/26/16); 202 So.3d 1189, 1198; *writs denied*, 16-2189 (La. 9/15/17); 225 So.3d 479 and 16-2093 (La. 1/29/18), 235 So.3d 1104. (*See State v. Gaddis*, 07-395 (La. App. 5 Cir. 11/13/07); 973 So.2d 21, 27-28, *writ denied*, 08-0156 (La. 10/10/08); 993 So.2d 1277, where the defendant argued that the victims' testimony should not have been believed because of inconsistencies. This Court acknowledged there were some differences in what one of the victims said during her CAC interview and her trial testimony. However, citing *State v. Simmons*, 03-20 (La. App. 5 Cir. 4/29/03); 845 So.2d 1249, 1258, this Court noted that the discrepancies were not necessarily indicative of untruthfulness or incompetence.[20] *Gaddis*, 973 So.2d at 27 n.14. This Court concluded that despite some slight inconsistencies regarding some of the details,

---

[20] In *Simmons*, *supra*, this Court recognized that memory lapse and alleged inconsistencies may have resulted from the child-victim's tender age of five years on the date of the incident, the traumatic nature of the experience, exposure to unfamiliar surroundings, or the method of interrogation.

both victims described numerous events that were substantially the same. This Court found the jury's decision to believe the victims' accounts of the events over the defendant's testimony was rational and that the State proved the essential elements of aggravated rape beyond a reasonable doubt; *see also State v. Barbain*, 15-404 (La. App. 4 Cir. 11/4/15); 179 So.3d 770, 777-78, *writs denied*, 15-2179 (La. 4/4/16); 191 So.3d 578 and 15-2213 (La. 4/4/16); 190 So.3d 1201, where the defendant challenged the sufficiency of his conviction for sexual battery, arguing that the victims' testimony was inconsistent as to who was living at the apartment, who slept in which bedroom, and where he was sleeping. He contended that since there was a lack of forensic or corroborative evidence, his conviction could not stand on the inconsistent testimony. The Fourth Circuit opined that, although the State presented only testimonial evidence, after observing the witnesses and weighing the evidence, the trial judge, who was the trier of fact in that matter, convicted the defendant of sexual battery, and that the testimony of the victims' supported this finding. *Id*., 179 So.3d at 778-79).

As for S.B., Defendant maintains that during her CAC interview, S.B. alleged only one act of abuse; whereas during her trial testimony, she alleged two. He further maintains that lack of identification is an issue as it pertains to the alleged offense committed by Defendant upon S.B. Specifically, Defendant notes that as to count three, the alleged victim was identified by bill of information by a date of birth of May 27, 2005; however, at trial, while S.B. testified that her date of birth is May 27, 2005, her mother testified that her daughter S.B. was born on May 28, 2005. Defendant contends that, while dates of birth are only relevant to determine whether the sentence can be enhanced, in this case, where they are the only means to designate the counts and identity of the victims, proof of S.B.'s date of birth is essential. He further argues that it is unclear which count concerns the alleged sexual abuse committed by Defendant on S.B.

First, during her CAC interview, S.B. testified regarding only one instance of sexual abuse by Defendant, *i.e.* when he touched her "private part." During her interview at the Audrey Hepburn Care Center and at trial, S.B. testified consistently regarding the first incident referenced during her CAC interview and a second incident when co-defendant Mesa forced S.B. to touch Defendant's "private part." The fact that a second sexual abuse allegation, which Defendant had notice of prior to trial, was not mentioned during her CAC interview, is not an inconsistency. Expert witness, Ms. Troy, explained that children exposed to sexual abuse are often interviewed by different providers, and as a result, their responses may vary depending on who they are speaking with. Meanwhile, expert witness Dr. Jackson explained that in some cases she receives more information from a victim than the victim has provided in a forensic interview—in a setting like the CAC—because the child is aware that he or she is going to have a physical examination and believes the doctor is going "to see something." It was further discussed that forensic interviews are done by asking open-ended questions in order to encourage a narrative while the interviews conducted at the Audrey Hepburn Care Center are more direct and to the point.

Moreover, the State need only prove one of the incidents as Defendant was only charged with one count of sexual battery of S.B. Here, either incident which fell within the date range of the offense contained in the bill of information would support the jury's guilty verdict.[21] Additionally, despite Defendant's assertion, S.B.'s identity as the victim in count three was established through her testimony

---

[21] *See State v. R.B.*, 10-0726 (La. App. 3 Cir. 2/2/11); 54 So.3d 1261, 1266, *writ denied*, 11-0457 (La. 9/23/11); 69 So.3d 1156, finding that the defendant's conviction for sexual battery was supported by sufficient evidence when the victim testified at trial that the defendant touched her on her "bottom" where she would "pee-pee from" on three occasions; *State v. Perkins*, 11-162 (La. App. 5 Cir. 12/28/11); 83 So.3d 250, 257, where this Court found that the victim's testimony that the defendant had touched and rubbed her vagina with his hand was sufficient to sustain a conviction for sexual battery; *State v. Bienvenu*, 14-541 (La. App. 5 Cir. 12/16/14); 167 So.3d 63, *writ denied*, 15-0098 (La. 11/20/15); 180 So.3d 314, where this Court found the evidence sufficient to convict the defendant of sexual battery of a child under the age of thirteen when the victim testified that the defendant made her touch his "private parts," and he touched her "private parts."

regarding her date of birth, which was correctly charged in the bill of information and through her testimony regarding the sexual battery she suffered at the hands of defendant in August of 2014, as further set forth in the bill of information.[22]

In any event, the jury heard all of the testimony, viewed all of the evidence presented at trial and, notwithstanding any alleged inconsistencies or ill motivations, found the defendant guilty of sexual battery of S.B. and D.V. As previously discussed, the trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact-finder's determination of guilt. *State v. Carraby*, 11-540 (La. App. 5 Cir. 2/14/12); 88 So.3d 608, 618, *writ denied*, 12-0669 (La. 10/12/12); 99 So.3d 37.

In sum, after viewing the evidence in a light most favorable to the State, we find that a rational trier of fact could have found Defendant guilty beyond a reasonable doubt of attempted forcible rape of J.C. and two counts of sexual battery of juvenile victims, S.B. and D.V., who were under the age of thirteen. Thus, we find there was sufficient evidence to support all three of Defendant's convictions.

Insufficient Record

Defendant argues the record is inadequate to properly preserve his right to appellate review. He submits that, although a corrected, supplemental copy of the record has been filed, there remain too many errors and omissions and many

---

[22] The written verdict sheet as to count three also provides that the jury found Defendant guilty as "to the charge of sexual battery of a known juvenile (DOB: 5/27/2005) under 13 years of age."

contradictions between the corrected record and the original record to lend confidence to a finding that the record is complete and accurate. Under such circumstances, Defendant avers he has effectively been denied his right to appellate review and is entitled to a new trial.

The State responds that Defendant has failed to show that any discrepancies or omissions in the transcripts have any bearing on the merits of his appeal. Because Defendant has failed to show how the alleged discrepancies are "material," the State submits that he is unable to establish that he has been prejudiced. The State further concludes that none of the issues pertinent to Defendant's appeal are un-reviewable based on an alleged incomplete record, and thus, Defendant is not entitled to reversal of his convictions.

La. Const. Art. I, § 19 provides that no person shall be subjected to imprisonment without the right of judicial review based upon a complete record of all evidence upon which the judgment is based. La. C.Cr.P. art. 843 requires, in all felony cases, the recording of "all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel."

A defendant has a right to a complete transcript of the trial proceedings, particularly where, as in this case, appellate counsel did not represent defendant at trial. Material omissions from trial court proceedings bearing on the merits of an appeal require reversal; however, a slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal does not require reversal of a conviction. A defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcript. *State v. Castleberry*, 98-1388 (La. 4/13/99); 758 So.2d 749, 773, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185

(1999); *State v. Hawkins*, 96-0766 (La. 1/14/97); 688 So.2d 473, 480; *State v. Lampkin*, 12-391 (La. App. 5 Cir. 5/16/13); 119 So.3d 158, 166, *writ denied*, 13-2303 (La. 5/23/14); 140 So.3d 717 (citing *State v. Cheatteam,* 07-272 (La. App. 5 Cir. 5/27/08); 986 So.2d 738, 746). "The materiality of a given omission is measured by the prejudicial effect of the omission on the defendant in accessing the full scope of appellate review." *State v. Pernell*, 13-0180 (La. App. 4 Cir. 10/2/13); 127 So.3d 18, 28, *writ denied*, 13-2547 (La. 4/4/14); 135 So.3d 640.

Here, Defendant filed a motion to supplement the record with a corrected transcript after the original record was lodged, and inaccuracies and omissions were noted. On October 31, 2018, this Court granted Defendant's motion, ordering that the district court supplement the appellate record with the "transcripts as corrected for accuracy, consistency and omissions of the trial proceedings beginning on March 13-20, 2018." Pursuant to this Court's order, a corrected, supplemental appellate record was filed, rectifying the original inaccuracies.

Defendant contends the supplement makes "it impossible to tell which version of the transcript is correct." However, the cases cited by Defendant do not support his position that discrepancies between an original and corrected record require reversal. In particular, Defendant cites to several cases where convictions have been reversed based upon an incomplete or missing appellate record which denied the defendants their right to appellate review.[23] Here, the deficiencies

---

[23] *See State v. Ford*, 338 So.2d 107, 110 (La. 1976), a second degree murder conviction in which appellate counsel did not serve as trial counsel, and the court reporter failed to record the testimony of four state witnesses, voir dire, and the State's opening statement. The Louisiana Supreme Court held: "[w]ithout a complete record from which a transcript for appeal may be prepared, a defendant's right of appellate review is rendered meaningless"; *State v. Jones*, 351 So.2d 1194 (La. 1977), where the Louisiana Supreme Court found the omission of a portion of the hearing on a motion for change of venue was not an "inconsequential omission" and required reversal because it was impossible to assess the existence of community prejudice or to ascertain whether the evidence supported the defendant's contention that the motion was improvidently denied; *State v. Parker*, 361 So.2d 226 (La. 1978), where reversal was required when the transcript of the closing argument could not be prepared, and defendant assigned as error the State's closing argument; *State v. Murphy*, 13-509 (La. App. 5 Cir. 12/19/13); 131 So.3d 1013, where this Court found the defendant was deprived of his right to appellate review due to a malfunctioning of the court reporter's recording equipment resulting in the omission of portions of the hearing transcript necessary to a review of the defendant's motion to suppress).

Defendant took issue with in the original appellate record have been remedied by the corrected supplement to the appellate record, and thus, Defendant has not suffered any prejudice as a result. The supplemental record appears to provide the necessary information for a complete review required for Defendant to perfect his appeal. Defendant discusses in great deal the flaws contained in the original appellate record lodged with this Court but fails to identify any specific omissions or inaccuracies in the supplemental appellate record that would preclude the raising of any specific assignment of error or that are pertinent to any of the issues raised by Defendant on appeal.

Accordingly, we find that Defendant has not demonstrated or particularized how he has been prejudiced by the filing of the corrected, supplemental appellate transcripts. The supplemented transcripts do not contain any material omissions that would preclude Defendant a complete appellate review nor are the supplemental transcripts so lacking that any of the assignments of error presented on appeal could not be addressed. Therefore, we find that the record is sufficient for a proper appellate review.

Denial of Motion for Mistrial

Defendant argues the trial court erred by finding one of the alleged victims, D.V., competent to testify. He claims that the colloquy in which the trial court engaged with D.V. was wholly inadequate to form the relevant inquiry of whether she had the ability to distinguish truth from fiction and, in fact, showed that she could not. Thus, Defendant maintains that his motion for mistrial was erroneously denied after the attempted cross-examination of D.V. made evident her lack of competence.

The State argues that Defendant's motion for mistrial was not based upon the supposed "incompetency" of D.V. but rather on an alleged inability to cross-examine D.V. due to her "memory issues"; thus, the State submits that Defendant

has not preserved this issue for review, as he failed to contemporaneously object under La. C.Cr.P. art. 841 on the ground now raised on appeal. Alternatively, the State maintains the trial court's ruling that D.V. was competent to testify was correct and not an abuse of its discretion.

Every person of proper understanding is competent to be a witness except as otherwise provided by legislation. La. C.E. art. 601. "Understanding, not age, is the test of competency for any witness." *State v. Foy*, 439 So.2d 433, 435 (La. 1983); *State v. Chester*, 14-540 (La. App. 5 Cir. 11/25/14); 165 So.3d 1006, 1009. A vital determination to be ascertained is whether the witness understands the difference between the truth and falsehoods. *Id.* The competency of a child to testify as a witness is based not only on the child's answers to questions testing his understanding but also on the child's overall demeanor. *Id.* A child's sometimes hesitant or unresponsive answers do not necessarily indicate incompetency. *Id.*; *State v. Humphrey*, 412 So.2d 507, 516 (La. 1982). Those answers may be part of an overall demeanor in the unfamiliar courtroom experience which favorably reflects testimony only as to what is clear to the child. *Chester*, 165 So.3d at 1009.

A trial court's determination on the competency of a child to testify is entitled to great weight on appeal because the trial court judge has the crucial advantage of seeing and hearing the child. *State v. Troulliet*, 94-183 (La. App. 5 Cir. 9/14/94); 643 So.2d 1267, 1270 (citing *Foy*, *supra*). The trial court judge is vested with wide discretion in determining the competency of the child witness and his ruling will not be disturbed on appeal, absent manifest abuse of discretion. *Chester*, 165 So.3d at 1009.

During trial, the State called D.V. as a witness. Prior to her testimony, she underwent a competency examination. During the colloquy with the trial court, D.V. stated that she was in fourth grade at Johnson Gretna Park Elementary School. She spoke with the trial court about the name of her teacher and her

favorite subject in school. The trial court then discussed with D.V. the importance of discussing things that are real and things that are true, and questioned D.V. as to whether she understood the difference between a lie and the truth and whether something is real or pretend. D.V. answered affirmatively and engaged with the trial court in some hypothetical questions to assess whether D.V. did, in fact, know the difference. D.V. assured the trial court that she would only testify regarding things that actually happened and promised to tell only the truth. Thus, the trial court deemed her competent to testify.

Without objection by defense counsel, the jury returned to the courtroom where the trial court informed them that D.V. would be testifying and given her status as a child witness, her competency had been evaluated. The trial court further informed the jury that it had deemed D.V. competent to testify and instructed the jury that her credibility should be judged in the same manner as any other witness.

At the conclusion of D.V.'s testimony, the defense moved for a mistrial, asserting:

> Not only is incompetency to testify one of the reasons why they cannot play these films and things, but also if the person, the child testifying does not remember –and she didn't remember an awful lot—it makes it very difficult to cross-examine her when she doesn't remember.

In response, the State noted that D.V. testified as to the crimes committed upon her. It argued that the defense had an adequate opportunity to cross-examine D.V., despite D.V. stating, "I don't remember" to some of the questions posed to her. After listening to the arguments of trial counsel, the court found as follows:

> Okay. So there is no question that playing the CAC tape is based upon the witness being available to testify. The witness clearly was here. She did testify. She testified under direct. She testified under cross. There was also times when she was unable to recollect certain things. I don't think that her memory was so faulty that it prevented an effective cross-examination. So I am going to deny the motion for those reasons.

On appeal, Defendant now argues the trial judge's finding of competency as to child witness D.V. was without adequate legal or factual basis. He asserts that in questioning D.V., the trial court did not ask sufficient questions to determine the most basic issues that would inform its determination regarding her competency, concluding the trial court was derelict in its duty to evaluate D.V.'s competency prior to permitting her to testify. He does not raise on appeal the issue of an alleged Confrontation Clause error due to the admission of the CAC video and D.V.'s "memory issues," which appear to be the subject of Defendant's motion for mistrial. Thus, Defendant has raised a new argument on appeal regarding the trial court's competency ruling which was not addressed below. Accordingly, we find that Defendant has waived his right to review on appeal the trial court's alleged error in finding D.V. competent to testify. *See* La. C.Cr.P. art. 841; *State v. Berroa-Reyes*, 12-581 (La. App. 5 Cir. 1/30/13); 109 So.3d 487, 499.

Non-unanimous Verdict

Defendant argues that because the record does not contain the verdict sheets as ordered by the court, the composition of the vote cannot be determined, and therefore, Defendant maintains it is appropriate to presume that they were not unanimous. Accordingly, Defendant avers that since non-unanimous verdicts are illegal and invalid, his convictions should be reversed.

The State asserts that the offenses in this case were committed before the change to La. C.Cr.P. art. 782 took effect which now requires unanimous juries; thus, it maintains that the verdicts in this case were obtained in accordance with the applicable law that previously established that non-unanimous verdicts do not violate the Constitution.

Defendant did not preserve this issue for appeal because the record indicates that Defendant did not raise this issue in the trial court. Defendant did not file any

motion challenging the constitutionality of the statutes regarding non-unanimous jury verdicts nor did he object to the jury instruction that ten jurors were required to agree in order to convict him. Moreover, the record reflects that during deliberations the jury presented a question to the trial court which read, in pertinent part, "[d]o we deliberate until we have ten?" After discussing the matter with trial counsel, all parties agreed, with no objection, to provide the following response: "[i]n order to have a valid verdict on any count including this one, as you are aware, at least ten of you must agree."

Where a statute is alleged to be unconstitutional, the state attorney general must be served with a copy of the proceeding and given the opportunity to be heard. La. C.C.P. art. 1880. While there is no single procedure for attacking the constitutionality of a statute, the unconstitutionality of a statute must be specially pleaded and the grounds for the claim particularized. *State v. Napoleon*, 12-749 (La. App. 5 Cir. 5/16/13); 119 So.3d 238, 245. A constitutional challenge may not be considered by an appellate court, unless it was properly pleaded and raised in the trial court below. *State v. Hatton*, 07-2377 (La. 7/1/08); 985 So.2d 709, 718. As such, we find that Defendant cannot raise this issue on appeal.[24]

Excessive Sentence

In his final assignment of error, Defendant argues his sentences are excessive in that they should not have been imposed consecutively. He maintains that, although the alleged crimes were committed against different victims, they are part of a continuing course of conduct and should be deemed to constitute a

---

[24] Nonetheless, the language of La. Act. 2018, No. 722, § 1, effective December 12, 2018, and La. Act 2018, No. 493, § 1, effective January 1, 2019, amending La. Const. art. 1, § 17(A) and La. C.Cr.P. art. 782(A), respectively, are clear that the amendment requiring unanimous jury verdicts for crimes whose punishment is necessarily confinement at hard labor applies only in those cases where the offenses are committed on or after January 1, 2019. Before the amendment, and at the time of the instant offenses, the constitutionality of non-unanimous jury verdicts was upheld in both *State v. Bertrand*, 08-2215 and 08-2311 (La. 3/17/09); 6 So.3d 738 and *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). As an intermediate court, this Court is bound by that precedent. *State v. Williams*, 18-112 (La. App. 5 Cir. 11/7/18); 259 So.3d 563, 580, *writ denied*, 18-2038 (La. 4/22/19); 268 So.3d 295.

common scheme or plan.  Thus, Defendant contends the erroneous imposition of consecutive terms has resulted in a constitutionally excessive term of years.

The State argues that Defendant's sentences are not constitutionally excessive and were properly ordered to be served consecutively, having been committed against three separate juvenile victims.  Accordingly, the State concludes the trial court did not abuse its broad sentencing discretion in imposing the sentences in this case.

 The record in this case reflects that, while Defendant objected to his sentences after imposition, he also submitted a written motion to reconsider his sentences—which alleged that the sentences were "excessive" and that the trial court failed to consider "mitigating circumstances."  Defendant did not challenge their consecutive nature in his motion nor state any other specific ground upon which the motion was based.  Defendant also failed to specifically object to the consecutive nature of his sentences at the time of sentencing.

In the past, this Court has held that when the consecutive nature of sentences is not specifically raised in the trial court, then the issue is not included in the bare review for unconstitutional excessiveness, and the defendant is precluded from raising the issue on appeal.  *See State v. Escobar-Rivera*, 11-496 (La. App. 5 Cir. 1/24/12); 90 So.3d 1, 8, *writ denied*, 12-0409 (La. 5/25/12); 90 So.3d 411; *See also State v. Williams*, 10-265 (La. App. 5 Cir. 11/9/10); 54 So.3d 98, 103.  Defendant is, therefore, not entitled to review of the consecutive nature of his sentences in this appeal and is consequently limited to a bare review of his sentences for unconstitutional excessiveness.  *State v. Hills*, 03-716 (La. App. 5 Cir. 12/9/03); 866 So.2d 278, 286, *writ denied*, 04-1322 (La. 4/22/05); 899 So.2d 569; *See also Escobar-Rivera*, 90 So.3d at 8.

Although Defendant's sole basis for challenging the alleged excessiveness of his sentences is based upon their consecutive nature, to the extent Defendant

challenges the individual terms of imprisonment imposed on each of his three convictions, the following is presented.

The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. *State v. Horne*, 11-204 (La. App. 5 Cir. 2/14/12); 88 So.3d 562, 569, *writ denied*, 12-0556 (La. 6/1/12); 90 So.3d 437; *State v. Wickem*, 99-1261 (La. App. 5 Cir. 4/12/00); 759 So.2d 961, 968, *writ denied*, 00-1371 (La. 2/16/01); 785 So.2d 839. The trial judge is afforded broad discretion in sentencing, and a reviewing court may not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D); *State v. Berry*, 08-151 (La. App. 5 Cir. 6/19/08); 989 So.2d 120, 131, *writ denied*, 08-1660 (La. 4/3/09); 6 So.3d 767; *State v. Pearson*, 07-332 (La. App. 5 Cir. 12/27/07); 975 So.2d 646, 656.

In reviewing a sentence for excessiveness, an appellate court must consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice. *State v. Lobato*, 603 So.2d 739, 751 (La. 1992). On review, an appellate court does not determine whether another sentence might have been more appropriate but whether the trial court abused its discretion. *Pearson*, 975 So.2d at 656; *Horne*, 88 So.3d at 569. In considering whether the trial court abused its discretion in sentencing a defendant, a reviewing court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes by other courts. *Horne*, 88 So.3d at 569.

Upon review of the record in this case, we find that Defendant's sentences on counts one, three, and four are not unconstitutionally excessive. At sentencing, the trial court stated that it had taken into consideration the relevant provisions of

La. C.Cr.P. art. 894.1, the testimony adduced at trial, and the seriousness of the offenses before imposing the sentences. The court further noted the sentences were to be served consecutively to each other because there were "three separate victims and separate incident dates." The court believed that "to do otherwise would diminish the seriousness of the offenses as to any particular victim."[25]

Defendant was sentenced to ten years imprisonment without benefit of probation, parole, or suspension of sentence for his conviction for attempted forcible rape of a juvenile, half the maximum the trial court could have imposed under La. R.S. 14:42.1 and La. R.S. 14:27, which provided for a sentencing range of not more than 20 years with at least two years of the sentence to be served without benefit of probation, parole, or suspension of sentence. *See* La. R.S. 14:42.1(B) and La. R.S. 14:27(D)(3). Defendant was further sentenced to 25 years imprisonment without benefit of probation, parole, or suspension of sentence, for each of his two convictions for sexual battery of a juvenile under the age of thirteen, the minimum sentence the trial court could have imposed under La. R.S. 14:43.1, which provides for a sentencing range of 25 to 99 years imprisonment with at least 25 years to be served without benefit of probation, parole, or suspension of sentence. *See* La. R.S. 14:43.1(C)(2).

When considering the nature and background of Defendant, the record indicates that he is a first-time felony offender; however, the record reflects that the nature of the crimes he committed against three separate juvenile victims at different times from 2013 to 2014 are egregious. The testimony at trial established that while in the care of Defendant's wife, who also perpetrated acts of sexual abuse against some of the victims, Defendant exploited his position of trust to commit, or attempt to commit, unthinkable acts of sexual abuse against a thirteen-

---

[25] The trial court also listened to victim impact statements from D.V's mother and S.B.'s mother. During their statements they expressed the trust they had put in Defendant and co-defendant and how the crimes committed against their daughters have destroyed their lives.

year-old girl, a six-year-old girl, and a nine-year-old girl.

The first victim, D.V., testified that Defendant would make her touch his "private part" and one time tried to make her "lick his private part." She further recalled a time when defendant pulled down her shirt and licked her breasts. The second victim, J.C., testified that after Defendant served her alcohol, he forced her into his bedroom, pushed her onto the bed and vaginally raped her. J.C. stated that when she resisted, Defendant hit her and told her to "shut up." And the third victim, S.B., testified that while sleeping at Defendant's house, she woke up to find Defendant touching her vagina, and on another occasion, co-defendant Mesa grabbed S.B.'s hand and made her touch Defendant's penis. The record further established that Defendant threatened harm to each of the victims and/or their family members if they told anyone what had happened.

Lastly, the same or harsher sentences have been imposed for similar crimes by this Court and other courts and have been upheld as constitutional.

With respect to the crime of sexual battery of a juvenile under the age of thirteen, in *State v. Junek*, 12-0865 (La. App. 1 Cir. 12/21/12); 2012 WL 6681854 (unpublished opinion), the defendant was convicted of sexual battery of a juvenile under thirteen years old and was sentenced to the minimum of twenty-five years at hard labor without benefit of probation, parole, or suspension of sentence. The facts at trial established that the defendant, who was approximately 20 years old at the time of the offense, was dating and living with the victim's aunt. One night while the victim and her sister were at their trailer, they were watching television, when the victim's aunt left the room, leaving the defendant alone with the two girls. The defendant made the victim, who was approximately seven at the time of the offense, touch his penis. The appellate court reviewed the record and found that it supported the sentence imposed. Based on its review, the appellate court could not say that the district court abused its discretion in imposing the statutory

minimum sentence.

Similarly, in *State v. Sims*, 11-1876 (La. App. 1 Cir. 5/2/12); 2012 WL 1552048 (unpublished opinion), the defendant was convicted of sexual battery of a juvenile under the age of thirteen and was sentenced to the minimum of 25 years at hard labor without benefit of parole. On appeal, the defendant contended the trial court imposed a constitutionally excessive sentence, arguing he was convicted of the momentary, one-time touching of the victim, and there was no evidence he threatened her or that she needed counseling to recover from the offense. He also argued he had no prior criminal record. The facts at trial showed that the victim and her siblings were living with their mother and her boyfriend, the defendant, at the time of the incident. The victim, who was approximately eleven at the time of the offense, testified that the defendant came into her room and touched her on her private parts on her skin and indicated he touched her in the "front" and in the "back." In imposing sentence, the trial court noted the defendant had no prior criminal record but found him to be in need of correctional treatment or a custodial environment that could be provided most effectively by his commitment to an institution. The appellate court found that a thorough review of the record revealed the sentence imposed was not grossly disproportionate to the severity of the offense and thus was not unconstitutionally excessive.

In *State v. Redfearn*, 44,709 (La. App. 2 Cir. 9/23/09); 22 So.3d 1078, 1087, *writ denied*, 09-2206 (La. 4/9/10); 31 So.3d 381, the defendant argued that his sentence of 40 years for his conviction of sexual battery and 30 years for his conviction of aggravated incest were excessive because he had no prior record, other than a DWI. Prior to sentencing, the trial court reviewed a presentence investigation, took into account the defendant's social and personal history, considered his lack of remorse and violation of the children's trust, as well as considered mitigating factors such as the lack of criminal history. The court found

that the offenses were so egregious that a severe sentence would not be excessive. The court found that the 40-year sentence imposed for sexual battery, while unquestionably harsh, was less than half the maximum sentence. The court further determined that the trial court adequately considered and articulated appropriate sentencing factors, and considering the heinous nature of the case, the sentences did not shock the sense of justice and therefore were not excessive.

In *State v. Lilly*, 12-0008 (La. App. 1 Cir. 9/21/12); 111 So.3d 45, *writ denied*, 12-2277 (La. 5/31/13); 118 So.3d 386, the defendant was convicted of sexual battery in violation of La. R.S. 14:43.1(C)(2) and was sentenced to 35 years at hard labor without benefit of parole. The victim, who was four years old at the time of the incident, testified that the defendant touched her on her vagina while he was babysitting. On appeal, the defendant argued that the sentence was excessive for a 57-year-old first-felony offender where the State, at most, showed a fingertip touching of the victim's vaginal area. The appellate court upheld the sentence, noting that the victim's age made her particularly vulnerable and that the defendant was in a position of trust.

Moreover, while Defendant received minimum sentences on his two counts of sexual battery of a juvenile under the age of thirteen, the "jurisprudence indicates that maximum, or nearly maximum terms of imprisonment may not be excessive when the defendant has exploited a position of trust to commit sexual battery or indecent behavior with a juvenile." *State v. Badeaux*, 01-406 (La. App. 5 Cir. 9/25/01); 798 So.2d 234, 239, *writ denied*, 01-2965 (La. 10/14/02); 827 So.2d 414.

Further, with respect to the crime of attempted forcible rape of a juvenile, the Louisiana Supreme Court held that a sentence of 17 ½ years at hard labor with the first year to be served without benefit of parole or probation was not excessive for an 18-year-old defendant who committed attempted forcible rape, even though

he had no prior convictions and was a "slow learner" in *State v. Middlebrook*, 409 So.2d 588, 592 (La. 1982).

Also, in *State v. Thompkins*, 04-1062 (La. App. 5 Cir. 2/15/05), 896 So.2d 1165, the defendant was sentenced to serve 15 years imprisonment at hard labor for attempted forcible rape. This Court found the record supported the defendant's 15-year sentence, where it was established that the defendant grabbed the victim by her hair and dragged her to a canal bank. After forcing her into the backset of his car, the defendant then repeatedly struck the victim while attempting to have sexual intercourse with her. Accordingly, this Court found nothing in the record to reflect that the trial judge abused her broad discretion in imposing the 15-year sentence.

And in *State v. Stewart*, 47,679 (La. App. 2 Cir. 1/16/13); 109 So.3d 915, 917-18, *writ denied*, 13-0303 (La. 9/20/13); 123 So.3d 163, the Second Circuit found the defendant's two consecutive sentences of 20 years imprisonment each for two counts of attempted forcible rape on two young boys were neither grossly disproportionate to the severity of the offense nor did they shock the sense of justice. The Second Circuit considered the fact that the defendant's actual conduct fit the offense of aggravated rape, which was punishable by life imprisonment, and further took into consideration the impact on the young victims in reaching its holding. [26]

Based on the foregoing, we find the record supports the sentences imposed on Defendant's conviction for attempted forcible rape of a juvenile, and his convictions on two counts of sexual battery of a juvenile under the age of thirteen. Moreover, here, as in *Stewart*, *supra*, Defendant's actual conduct fit the offense of aggravated rape, which was punishable by life imprisonment. Accordingly, we

---

[26] *See also State v. Wilson*, 42,075 (La. App. 2 Cir. 5/9/07); 957 So.2d 345, 347-49; *State v. Vargas-Alcerreca*, 12-1070 (La. App. 4 Cir. 10/2/13); 126 So.3d 569, 583-84, *writ denied*, 13-2588 (La. 4/17/14), 138 So.3d 625; *State v. Phillips*, 29,020 (La. App. 2 Cir. 12/11/96); 685 So.2d 565.

conclude the trial court did not abuse its wide discretion in imposing the sentences in this case as they are not grossly disproportionate to the severity of the crimes.

Errors Patent Discussion

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990).

The record does not reflect that Defendant was notified of Louisiana's sex offender registration requirements pursuant to La. R.S. 15:540 *et seq.* Defendant's convictions for attempted forcible rape (La. R.S. 14:27 and La. R.S. 42.1) and sexual battery of a juvenile under the age of 13 (La. R.S. 14:43.1) are defined as sex offenses by La. R.S. 15:541(24).

La. R.S. 15:543(A) states that the trial court "shall provide written notification to any person convicted of a sex offense and a criminal offense against a victim who is a minor of the registration requirements and the notification requirements" of La. R.S. 15:542 and La. R.S. 15:542.1. In addition, La. R.S. 15:543(A) states that the trial court shall use the form contained in La. R.S. 15:543.1 to inform the defendant of the registration and notification requirements. La. R.S. 15:543(A) further requires that such notice be included on any guilty plea forms and judgment and sentence forms provided to the defendant and that an entry be made in the court minutes stating that written notification was provided.

Here, the record indicates that the trial court did not comply with La. R.S. 15:543(A). A trial court's failure to provide this notification constitutes an error patent and warrants a remand for written notification. *See State v. Raye*, *supra*; *Lampkin*, 119 So.3d at 168 (citing *State v. Pierce*, 11-320 (La. App. 5 Cir. 12/29/11); 80 So.3d 1267, 1279-80).

Accordingly, we remand this matter to the trial court for the purpose of providing Defendant with the appropriate written notice of his sex offender

notification and registration requirements, using the form contained in La. R.S. 15:543.1.

**DECREE**

For the foregoing reasons, we affirm Defendant's convictions and sentences. Furthermore, we remand the matter to the trial court for the purpose of providing Defendant with the appropriate sex offender notification and registration requirements.

**<u>AFFIRMED; REMANDED WITH INSTRUCTIONS</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **NOVEMBER 27, 2019** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 18-KA-500

## E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN C. GREFER (DISTRICT JUDGE)
TERRY M. BOUDREAUX (APPELLEE)      GWENDOLYN K. BROWN (APPELLANT)      COLIN CLARK (APPELLEE)
J. TAYLOR GRAY (APPELLEE)          GRANT L. WILLIS (APPELLEE)          THOMAS J. BUTLER (APPELLEE)

## MAILED

LAURA S. SCHNEIDAU (APPELLEE)
ASSISTANT DISTRICT ATTORNEY
PARISH OF JEFFERSON
200 DERBIGNY STREET
GRETNA, LA 70053

HON. PAUL D. CONNICK, JR. (APPELLEE)
ANNE M. WALLIS (APPELLEE)
EMILY E. BOOTH (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053

HON. JEFFREY M. LANDRY (APPELLEE)
ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 NORTH 3RD STREET
6TH FLOOR, LIVINGSTON BUILDING
BATON ROUGE, LA 70802